

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ELLEN B. MCFARLAND; DANIELLE DONO;     )
AUGUSTUS B. RANDLE; RHONDA BAILEY;     )
RENELL BEACH; RICHARD H. BRYAN;        )
REBECCA BULLARD; ROBERT L.             )
CARMIGNANI; RICHARD A. COBB;           )     CIVIL ACTION FILE
ROBERT COHAN; ROBERT G. COHEN;         )
RICHARD L. CONRAD; RODNEY DAVIS;       )     NO. _____
REGINA M. DUNSTER; REBECCA             )
ETHERTON; ROBERT M. FAIRFIELD;         )     1 03 CV 2244
RINDALEE FORSYTH; RICHARD FOWLER;      )
ROBERT. GRAY; ROBERT D. HELLYER;       )          ODE
ROBERT J. HERBOLICH; RENITA H.         )
HUNLEY; ROBERT L. JOLLEY; RICHARD      )
E. JUDD; ROBBIE R. KELL; RENEE M.      )
LONCKE; REGINA LOWMAN-CURBEAN;         )
ROBERT G. LUCE; ROBIN MACARTHUR;       )
ROBERT MCCLAMY; RITA M. MOORE;         )
RHONDA G. MULLINS; RICHARD D. NELL;    )
ROBERT E. NICHOLS; ROBERT NOVOTNY;     )
RICHARD F. ORLUK; REBECCA A.           )
PANTUSO; RICHARD N. PILANT; ROBERTA    )
RINALDI; RICHARD ROCHA; RHONDA         )
SAMPLE; REBECCA D. SCHULTZE;           )
RICHARD E. SCUTERI; REGINA STANLEY;    )
REGINA W. STEPHENS; REBECCA A.         )
TENA; ROBERT E. VANDERPOOL;            )
RICHARD WELDON; RHONDA WILMOT;         )
RENEE K. YANCEY,                       )
                                       )
                        Plaintiffs,    )
                                       )
v.                                     )
                                       )
_____)

claims of all the plaintiffs except for Danielle Dono – the only plaintiff who asserts claims against a properly joined non-diverse defendant.

## Preliminary Statement

Plaintiffs allege that they were injured by the diet drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine. Pondimin often was taken in combination with phentermine. Wyeth sold Pondimin and Redux, but not phentermine. Phentermine was sold by a number of other companies.

All federal diet drug cases have been consolidated before the United States District Court for the Eastern District of Pennsylvania (the "MDL Court") since 1997. The MDL Court has developed substantial expertise with respect to the legal and scientific issues presented in diet drug cases. In 2000, the MDL Court approved a nation-wide class action settlement (the "National Settlement"). The settlement class includes all diet drug users except for those who opted out of the class. Plaintiffs allege that, although they are members of the settlement class, they may sue under provisions of the National Settlement that permit class members to file lawsuits in certain circumstances.[1]

---

[1] It is yet to be determined whether plaintiffs meet the medical and other criteria for being permitted to assert such claims under the terms of the National Settlement. If they do not meet those criteria, an existing injunction entered by the MDL Court bars and enjoins plaintiffs from asserting their claims. Brown v. Am. Home Prods. Corp., Nos. 1203 and 99-20593, 2000 WL 1222042, at *72 (E.D. Pa.

*Footnote continued on next page*

There has been an explosion of cases in the diet drug litigation in which plaintiffs attempt to evade the MDL Court by filing lawsuits in state court, fraudulently joining non-diverse defendants, against whom there is no reasonable possibility of recovery or any good faith intent to pursue a claim, and misjoining in one complaint the claims of dozens or even hundreds of plaintiffs, only one or a small number of whom are not diverse from Wyeth.  The MDL Court addressed this problem in <u>Anderson v. American Home Products Corporation</u>, 220 F. Supp. 2d 414 (E.D. Pa. 2002), explaining:

> What has been transpiring can only be characterized as a <u>sham</u>, at the unfair expense not only of AHP [now known as Wyeth] but of many individuals and small enterprises that are being unfairly dragged into court simply to prevent the adjudication of lawsuits against AHP, the real target, in a federal forum.

<u>Id.</u> at 425 (emphasis added).  The Court cautioned that "'so long as federal diversity jurisdiction exists . . . the need for its assertion may well be greatest when plaintiff tries hardest to defeat it.'"  <u>Id.</u> (quoting <u>Boyer v. Snap-on Tools Corp.</u>, 913 F.2d 108, 111 (3d Cir. 1990)).

---

*Footnote continued from previous page*
Aug. 28, 2000).  If this case is transferred to the MDL Court, the MDL Court will determine whether plaintiffs meet those criteria.

In <u>Anderson</u>, the MDL Court specifically held that the plaintiffs had fraudulently joined phentermine manufacturers, sales representatives, pharmacies and doctors to try to defeat diversity jurisdiction. 220 F. Supp. 2d at 420-25. The MDL Court concluded that the phentermine defendants were fraudulently joined because, among other things, there is no epidemiologic data that phentermine actually causes heart problems, and phentermine defendants have been "routinely and voluntarily dismissed from hundreds of cases by plaintiffs without any settlement." <u>Id.</u> at 421; <u>see also id.</u> at 420. The MDL Court also concluded that the sales representative defendants were fraudulently joined, noting that the complaints failed to allege that the sales representatives supplied plaintiffs or their doctors with any drugs, failed to comply with Federal Rule of Civil Procedure 9(b), and failed to provide a reasonable basis for any claim under state law. <u>Id.</u> at 424-25. The MDL Court further concluded that the pharmacy defendants were fraudulently joined because there was no basis for a claim against them under state law and diet drug plaintiffs "never pursued [them] to judgment." <u>Id.</u> at 424.

Addressing the claims against the defendant doctors, the MDL Court found that forty-eight of the fifty plaintiffs had not been treated by the doctors. Accordingly, the claims of the only two plaintiffs who had been treated by non-diverse doctors were remanded to state court, and the MDL Court retained

diversity jurisdiction over the claims of the other forty-eight plaintiffs. <u>Anderson</u>, 220 F. Supp. 2d at 422.  This was consistent with the MDL Court's prior decision in <u>Chaney v. Gate Pharmaceuticals</u>, No. Civ.A. 98-20478, 1999 WL 554584 (E.D. Pa. July 16, 1999).  In that case, plaintiffs had attempted "to join persons from seven different states into one civil action who have absolutely no connection to each other except that they each ingested fenfluramine, Redux (dexfenfluramine), phentermine or some combination of those drugs." <u>Id.</u> at *3.  The MDL Court found joinder of such claims in one pleading was "devoid of any redeeming feature as respects the underlying purpose of the joinder rules." <u>Id.</u>  It thus severed the claims of the non-diverse plaintiffs and retained jurisdiction over the claims of the diverse plaintiffs, applying the approach that the Eleventh Circuit Court of Appeals approved in <u>Tapscott v. M.S. Dealer Service Corp.</u>, 77 F.3d 1353 (11th Cir. 1996), <u>abrogated on other grounds</u>, <u>Cohen v. Office Depot</u>, 204 F.3d 1069 (11th Cir. 2000). <u>Chaney</u>, 1999 WL 554584, at *2-*4.

Unfortunately, the sham litigation that the MDL Court tried to stop in <u>Anderson</u> continues.  In an effort to avoid the MDL Court, plaintiffs are filing scores of cases in Fulton County that fraudulently join defendants and plaintiffs from all over the United States.  The Complaint in this case is one example.  It incorporates the disparate claims of plaintiffs from several states whose residencies

6

are diverse from the real defendant in this case, Wyeth. Yet plaintiffs attempt to defeat federal jurisdiction as to these plaintiffs by fraudulently joining as defendants Indevus Pharmaceuticals and former Wyeth employees, and by naming just one plaintiff who is not diverse from Wyeth.

Plaintiffs' ploy must fail. As demonstrated below, Indevus Pharmaceuticals is fraudulently joined. Plaintiffs' claims against that defendant are time-barred, and plaintiffs fail to plead their fraud, misrepresentation and conspiracy to defraud claims against that defendant with the required particularity.

In addition, the Wyeth employee defendants are fraudulently joined. Plaintiffs have no reasonable basis for a claim against them and no good faith intent to pursue one. Among other things, plaintiffs do not allege that these defendants had any contact with plaintiffs or their doctors, and plaintiffs cannot show that these defendants harmed plaintiffs in any way.

Finally, the plaintiffs who are diverse from Wyeth – and whose claims clearly would be subject to federal jurisdiction if they had sued individually – cannot defeat Wyeth's right to removal simply by joining their claims with those of one or more plaintiffs who are not diverse from Wyeth. The claims of all plaintiffs who are diverse from Wyeth belong in federal court and this Court should sever and retain jurisdiction over them.

7

### The Complaint

1.

Wyeth is a defendant in a civil action brought against it in the State Court of Fulton County entitled Ellen B. McFarland, et al. v. Wyeth, Inc., et al., bearing Civil Action No. 2003VS053565.

2.

A copy of the Complaint and any process, pleadings and orders served on or by Petitioners are attached hereto as Exhibit A.

3.

The action was commenced by the filing of a Complaint on or about June 30, 2003 in the State Court of Fulton County.

4.

The Complaint names 50 individual plaintiffs. Based upon the allegations in the Complaint, the plaintiffs are citizens of the following States:

Arizona – Rebecca A. Tena.

Arkansas – Renell Beach.

Colorado – Rhonda G. Mullins; Richard Rocha.

Connecticut – Robert Gray; Robert Novotny; Rebecca D. Schultze.

Kansas – Rhonda Bailey; Rebecca Etherton; Rindalee Forsyth; Rhonda Sample.

Kentucky – Robert E. Vanderpool.

8

<u>Louisiana</u> – Rebecca Bullard.

<u>Maryland</u> – Robert Cohan; Regina Lowman-Curbean; Robin MacArthur; Robert McClamy; Regina Stanley.

<u>Michigan</u> – Richard A. Cobb.

<u>Minnesota</u> – Renee K. Yancey.

<u>Nebraska</u> – Renee M. Loncke.

<u>Nevada</u> – Richard L. Conrad; Robbie R. Kell; Rebecca A. Pantuso; Richard N. Pilant; Richard E. Scuteri.

<u>Ohio</u> – Robert G. Cohen; Robert J. Herbolich.

<u>Oregon</u> – Robert L. Carmignani; Rhonda Wilmot.

<u>South Carolina</u> – Rita M. Moore.

<u>Tennessee</u> – Augustus B. Randle.

<u>Utah</u> – Richard D. Nell.

<u>Virginia</u> – Richard H. Bryan; Rodney Davis; Regina M. Dunster; Richard Fowler; Robert D. Hellyer; Renita H. Hunley; Robert L. Jolley; Richard E. Judd; Roberta Rinaldi; Regina W. Stephens.

<u>Georgia</u> – Ellen B. McFarland.

<u>Massachusetts</u> – Robert M. Fairfield; Robert G. Luce; Robert E. Nichols; Richard F. Orluk; Richard Weldon.

<u>New Jersey</u> – Danielle Dono.

5.

The Complaint names as defendants Wyeth (formerly known as American Home Products Corporation) and Wyeth Pharmaceuticals, Inc. (formerly known as

9

Wyeth-Ayerst Pharmaceuticals, Inc.).  Also named as defendants are the following companies, which each manufactured and/or sold phentermine (the "phentermine defendants"):    Celltech  Pharmaceuticals,  Inc.  ("Celltech");  and  Medeva Pharmaceuticals,  Inc.  ("Medeva").[2]    Another  named  defendant  is  Indevus Pharmaceuticals, Inc. (formerly known as Interneuron Pharmaceuticals, Inc.) ("Indevus"), which was involved with the development of Redux.  The Complaint names three individuals as defendants, who are former Wyeth employees:  Robert L. Scott, John A. Molnar and Steven Kaiser.  The only other defendants are alleged to be "John Does."

6.

Wyeth is a Delaware corporation with its principal place of business in New Jersey.  Wyeth Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Pennsylvania.

7.

Based on the Complaint allegations concerning the phentermine defendants, Celltech is a Delaware corporation with its principal place of business in New York.  Medeva was merged into Celltech in 1998 and, to the extent Medeva exists,

---

[2]   Plaintiffs' case caption names Celltech, but not Medeva, as a defendant. However, in paragraph 31 of the Complaint, plaintiffs refer to "Defendant
*Footnote continued on next page*

10

Medeva is (and has been since 1998) a Delaware corporation with its principal place of business in New York. Documents from the Delaware Secretary of State and the Texas Secretary of State evidencing the merger and Medeva's citizenship (to the extent Medeva exists) are attached as Exhibit 1. The phentermine defendants' residencies are thus diverse from the residencies of all the plaintiffs.

8.

Based upon the allegations of the Complaint, Indevus is a Delaware corporation with its principal place of business in Massachusetts.

9.

Robert L. Scott, John A. Molnar and Steven Kaiser are citizens and residents of the State of Georgia.

**Defendant Indevus Is Fraudulently Joined**

10.

The presence of Indevus does not defeat removal because plaintiffs have no reasonable basis for a claim against Indevus and no good faith intent to pursue a claim against Indevus.

---

*Footnote continued from previous page*
MEDEVA." Accordingly, for the purposes of the removal notice, Petitioners are treating Medeva as a defendant.

11.

Indevus was involved with the development of Redux.  Plaintiffs have no reasonable basis for a claim against Indevus for several reasons, including the following.

First, any plaintiff claim against Indevus is time-barred.  The statute of limitations on a claim seeking recovery for personal injury is two years regardless of the legal theory on which the claim is brought.  O.C.G.A. § 9-3-33; Daniel v. Am. Optical Corp., 251 Ga. 166, 304 S.E.2d 383 (1983).[3]  The last day plaintiffs could have purchased "fen-phen" (the combination of Pondimin and phentermine) was September 15, 1997, when Pondimin and Redux were withdrawn from the market.  In addition, any alleged injury plaintiffs suffered as a result of diet drugs occurred no later than that time because there is no evidence that heart valve damage possibly associated with diet drugs is latent, meaning that it does not develop after use of the drugs has ceased.  Brown v. Am. Home Prods. Corp., Nos. 1203 and 99-20593, 2000 WL 1222042, at *46 (E.D. Pa. Aug. 28, 2000) (MDL Court finding "no evidence" of heart valve injuries developing later); see also Rainey v. Wyeth, No. 03-20128, slip op. at 7 n.4 (E.D. Pa. June 12, 2003)

---

[3]  Wyeth does not concede that Georgia law applies to plaintiffs' claims.  Wyeth cites Georgia law because plaintiffs' counsel has cited Georgia law on remand motions in other diet drug cases.

(attached as Exhibit 16) (MDL Court "found that there is no latency period between the time of drug use and injury").

Moreover, as a matter of law, all plaintiffs knew or should have known that diet drugs could possibly cause health problems by September or October 1997 because of massive national and local publicity. On July 8, 1997, the United States Department of Heath and Human Services issued a Health Advisory, and both the Food and Drug Administration and the Mayo Clinic issued press releases, concerning health risks possibly associated with the use of diet drugs. The September 15, 1997 withdrawal of the drugs from the market was accompanied by numerous press releases and advertisements. The withdrawal also was accompanied by massive publicity in the national and local media in the areas where each of the plaintiffs resides. Substantial additional publicity about the diet drugs and the national diet drug settlement appeared in the media between 1997 and early 2000, both nationally and in localities in which plaintiffs reside. See Declaration of Sharon Taylor (attached as Exhibit 15).

This mass of information put plaintiffs on inquiry notice of their claims. See United Klans of Am. v. McGovern, 621 F.2d 152, 154-55 (5th Cir. 1980) (per curiam) (agency press conference, press release, and publication of a Senate report led to conclusion that "in the exercise of due diligence, plaintiff should have

13

known that it had a potential claim"); <u>Hughes v. Vanderbilt Univ.</u>, 215 F.3d 543,

548-49 (6th Cir. 2000) (plaintiff should have known of potential claim where

publicity was extensive); <u>Winters v. Diamond Shamrock Chem. Co.</u>, 149 F.3d 387,

403-04 (5th Cir. 1998) (as a matter of law, extensive media coverage in the mid-

1980's concerning Agent Orange put plaintiff on notice at that time that she should

investigate her potential claim), <u>cert. denied</u>, 526 U.S. 1034 (1999).

   <u>Second</u>, plaintiffs' claims against Indevus for fraud, misrepresentation and

conspiracy to defraud fail for the additional reason that they are not pled with the

required particularity.  <u>See</u> Federal Rule of Evidence 9(b).  Plaintiffs fail to allege

exactly what misstatements Indevus made to whom, or when.   Such a failure

demonstrates that plaintiffs have no reasonable basis for their claims and have

fraudulently joined Indevus. <u>See Allen v. Tyson Foods, Inc.</u>, 153 F. Supp. 2d 886,

889-90 (S.D. Miss. 2001) (finding fraudulent joinder where plaintiff failed to

allege the "time, place or specific content" of the alleged false statements); <u>In re</u>

<u>Rezulin Prods. Liab. Litig.</u>, 133 F. Supp. 2d 272, 283 (S.D.N.Y. 2001) (finding

fraudulent joinder where plaintiffs failed to plead specific communications,

reliance, and other facts with specificity); <u>Jacobson v. Ford Motor Co.</u>, No. 98 C

742, 1999 WL 966432, at *4 (N.D. Ill. Sept. 30, 1999) (finding fraudulent joinder

14

because plaintiff had no chance of prevailing where complaint failed "to set forth any particularized allegations of fraudulent conduct" by the defendant).

12.

Plaintiffs have no good faith intent to pursue a claim against Indevus. Plaintiffs have joined Indevus solely to attempt to defeat diversity jurisdiction, and not to pursue any claim against it.

13.

If the Court has any doubt that Indevus is fraudulently joined, it should permit discovery on the issue.

### Defendants Scott And Molnar Are Fraudulently Joined

14.

The presence of Robert L. Scott and John A. Molnar does not defeat removal because plaintiffs have no reasonable basis for a claim against these defendants and no good faith intent to pursue a claim against them.  As Judge Thrash held in denying remand of another diet drug case, "[i]t is quite apparent that the only reason for joining these Defendants in this case was to defeat Wyeth's legitimate right to remove the case to federal court." Johnson v. Wyeth, 1:02-CV-1368, slip. op. at 4 (N.D. Ga. Jan. 3, 2003) (emphasis added) (attached as Exhibit 7).[4]

---

[4]  In Roane v. American Home Products Corp., No. 1:02-CV-2681 (N.D. Ga. Jan. 21, 2003), Judge Martin concluded, without mentioning Judge Thrash's earlier
*Footnote continued on next page*

~ Doc# 514098.02 ~

15.

To have a reasonable basis for a claim against Messrs. Scott and Molnar, plaintiffs would need to show that those defendants had some personal participation in a tort that harmed plaintiffs.  Messrs. Scott and Molnar cannot be liable merely because they are former employees of Wyeth.  James v. Parke-Davis, 1:00-CV-1203-JEC, slip. op. at 18-19, 21 (N.D. Ga. Nov. 30, 2000) (attached as Exhibit 8) (defendant must be the "guiding spirit behind the wrongful conduct" or "the central figure . . . in the challenged corporate activity"; internal quotation marks and citation omitted; finding fraudulent joinder of sales representatives in suit against drug company); see also DCA Architects, Inc. v. Am. Bldg. Consultants, Inc., 203 Ga. App. 598, 600, 417 S.E.2d 386, 389 (1992) (even a corporate officer is not personally liable unless he personally participated in or personally directed commission of tort).

---

*Footnote continued from previous page*
decision in Johnson, that plaintiffs had not fraudulently joined Mr. Scott because there was "a possibility" that the complaint "state[d] a cause of action" against him for fraud.  Yet Judge Martin also found that "in light of the evidence developed in similar lawsuits, it does not appear that the plaintiffs can recover on a fraud claim against Scott" (emphasis added).  Fraudulent joinder exists unless a plaintiff shows "'a reasonable basis for predicting that state law might impose liability on the facts involved.'"  Crowe v. Coleman, 113 F.3d 1536, 1542 (11th Cir. 1997) (quoting Bobby Jones Garden Apartments v. Suleski, 391 F.2d 172, 177 (5th Cir. 1968)).  Given her finding that plaintiffs could not recover against Mr. Scott for any liability based on fraud, Wyeth respectfully submits that Judge Martin erred in concluding that Mr. Scott was not fraudulently joined, and that Judge Thrash was correct in holding that Mr. Scott was fraudulently joined.

Messrs. Scott and Molnar did not have as part of their job responsibilities promoting diet drugs to patients or their physicians. Scott Affidavit ¶¶ 10–11 (attached as Exhibit 9); Scott Deposition Tr. 218-20 (attached as Exhibit 10); Molnar Affidavit ¶¶ 7-8 (attached as Exhibit 11); Molnar Deposition Tr. 264 (attached as Exhibit 12). Messrs. Scott and Molnar had no role in developing, selling or marketing diet drugs. Scott Affidavit ¶ 12; Scott Deposition Tr. 218-20; Molnar Affidavit ¶ 10; Molnar Deposition Tr. at 264. They had no role in obtaining government approval for diet drugs. Scott Affidavit ¶ 13; Molnar Affidavit ¶ 10.

Plaintiffs therefore attempt to base their claims against Mr. Scott on the contention that he gave incorrect information to certain state regulators in lobbying them to "deschedule" diet drugs – i.e., remove the drugs from a list of controlled substances. Plaintiffs try to base their claims against Mr. Molnar on the allegation that he gave incorrect information to members of the Tennessee Legislature in lobbying them to change a law regarding diet drugs. Plaintiffs have no basis for either claim for several reasons, including the following.

First, plaintiffs have no basis for their claim against Mr. Scott because none of the states whose regulators Mr. Scott contacted with respect to descheduling ever descheduled diet drugs. See Scott Affidavit ¶ 5, ¶ 7, ¶ 8 (Exhibit 9); Scott

17

Deposition Tr. 218 (Exhibit 10). Thus, despite any activities of Mr. Scott, the sale of diet drugs in those states continued to be subject to the same regulatory restrictions as they had been before those activities. Mr. Scott's alleged activities could not have injured plaintiffs.

Second, plaintiffs have no basis for a claim against Mr. Scott or Mr. Molnar because plaintiffs failed to comply with O.C.G.A. § 9-11-11.1. Plaintiffs' claims against Messrs. Scott and Molnar arise from their alleged lobbying of government officials with respect to laws and regulations affecting diet drugs. O.C.G.A. § 9-11-11.1 requires that any claim that "could reasonably be construed as an act in furtherance of the right of free speech or the right to petition government" be brought only if accompanied by verifications from both the party asserting the claim and the party's attorney of record. The verifications must state under oath that the party and the attorney have read the complaint, that the claim "is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law," that the speech at issue is not protected by O.C.G.A. § 51-5-7, and that the claim is not interposed for "any improper purpose." O.C.G.A. § 9-11-11.1. When a complaint does not contain the required verification, and the plaintiff fails to correct the defect, the court must dismiss the claim. Hawks v. Hinely, 252 Ga. App. 510, 516, 556 S.E.2d 547, 551

18

(2001); <u>Davis v. Emmis Publ'g Corp.</u>, 244 Ga. App. 795, 798, 536 S.E.2d 809, 812 (2000). Plaintiffs here have failed to provide the verification required under O.C.G.A. § 9-11-11.1 for their claims against Messrs. Scott and Molnar, and so have no basis for those claims.

Third, plaintiffs have no basis for a claim against Mr. Molnar for his actions in lobbying the Tennessee Legislature, or for Mr. Scott in lobbying state regulators, because those activities were protected by the First Amendment. <u>See, e.g.</u>, <u>Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127, 138-40 (1961) (upholding conduct of railroads in seeking to obtain legislation to disadvantage competing truck industry as protected under the First Amendment even though the railroads' tactics involved "deception of the public," "the manufacture of bogus sources of reference" and "distortion of public sources of information"); <u>Davric Maine Corp. v. Rancourt</u>, 216 F.3d 143, 147 (1st Cir. 2000) ("[e]ven <u>false</u> statements presented to support such petitions are protected"; citation omitted); <u>TEC Cogeneration, Inc. v. Fla. Power & Light Co.</u>, 76 F.3d 1560, 1571 (11th Cir.) (petitioning legislators is protected regardless of motives), <u>modified on other grounds</u>, 86 F.3d 1028 (11th Cir. 1996).

Fourth, as Judge Thrash held in the <u>Johnson</u> case, plaintiffs have no basis for a claim against Messrs. Scott or Molnar for a variety of other reasons. Plaintiffs

cannot recover on the theory that they were indirectly harmed as a result of a third party's alleged reliance on any fraudulent or negligent misrepresentations that Messrs. Scott or Molnar made.  Johnson, slip. op. at 4 (Exhibit 7) (no reasonable basis for this claim because plaintiffs "cannot show" that they or their doctors relied upon any misrepresentation that Messrs. Scott and Molnar made); see also Lawson v. Smith and Nephew Richards, Inc., No. Civ.A.4:96-CV0297RWS, 1999 WL 1129677, at *7 (W.D. Ga. Sept. 30, 1999) (plaintiff cannot base fraud claim on allegation that he was indirectly harmed by FDA's alleged reliance on misstatements); White v. BDO Seidman, LLP, 249 Ga. App. 668, 670-73, 549 S.E.2d 490, 493-94 (2001) (investor cannot base fraud claim on allegation that he was indirectly harmed by regulator's reliance on auditor's false report).

Plaintiffs' fraud claims against Messrs. Scott and Molnar also fail because they are not pled with the required particularity.  See Fed. R. Civ. P. 9(b); Allen v. Tyson Foods, Inc., 153 F. Supp. 2d 886, 889-90 (S.D. Miss. 2001) (finding fraudulent joinder where plaintiff failed to allege the "time, place or specific content" of the alleged false statements); In re Rezulin Prods. Liab. Litig., 133 F. Supp. 2d 272, 283 (S.D.N.Y. 2001) (finding fraudulent joinder where plaintiffs failed to plead specific communications, reliance, and other facts with specificity); Jacobson v. Ford Motor Co., No. 98 C 742, 1999 WL 966432, at *4 (N.D. Ill.

20

Sept. 30, 1999) (finding fraudulent joinder because plaintiff had no chance of prevailing where complaint failed "to set forth any particularized allegations of fraudulent conduct" by the defendant).

Plaintiffs likewise have no basis for their claims against Messrs. Scott or Molnar for conspiracy to defraud.  Messrs. Scott and Molnar did not enter into an agreement with any phentermine manufacturer or Indevus.  Johnson, slip. op. 4 (Exhibit 7) (finding that there was no proffered evidence of any such conspiracy); Scott Affidavit ¶ 14 (Exhibit 9); Scott Deposition Tr. 188-89 (Exhibit 10); Molnar Affidavit ¶ 11 (Exhibit 11); Molnar Deposition Tr. 180 (Exhibit 12).  Messrs. Scott and Molnar also could not have conspired with each other, with Mr. Kaiser, or with Wyeth, because, as a matter of law, a corporation cannot conspire with its own employees acting within the scope of their employment.  Johnson, slip. op. at 4 (Exhibit 7); see also Alta Anesthesia Assoc. of Ga., P.C. v. Gibbons, 245 Ga. App. 79, 85-86, 537 S.E.2d 388, 394-95 (2000) (corporation cannot conspire with itself). Plaintiffs' allegations are not pled with the requisite particularity in any event.

Finally, plaintiffs do not have a reasonable basis for a claim against Messrs. Scott or Molnar in this action because the MDL Court has held that an intermediate opt-out plaintiff – as plaintiffs in this case purport to be – cannot introduce evidence against Wyeth concerning descheduling of diet drugs.  See Brown v. Am.

Home Prods. Corp., No. 99-20593, slip op. at 3 (E.D. Pa. Jan. 29, 2003) (attached as Exhibit 17).[5]   The MDL Court held that such evidence would constitute an improper attempt to inflame the jury and circumvent the Settlement Agreement's prohibition against intermediate opt-out plaintiffs seeking punitive damages from Wyeth.   See id.   The MDL Court further held that such a plaintiff cannot circumvent this prohibition by seeking to admit such evidence against other defendants. See Brown v. Am. Home Prods. Corp., No. 99-20593, slip op. at 39-40 (E.D. Pa. April 8, 2003) (attached as Exhibit 14).   These orders, while directly applicable to the plaintiffs there, constitute an interpretation of the Settlement Agreement equally applicable to these plaintiffs, with the result that they could not even introduce any evidence concerning any alleged descheduling activities of Messrs. Scott or Molnar.

16.

Plaintiffs have no good faith intent to pursue a claim against Messrs. Scott or Molnar.  Plaintiffs have joined Messrs. Scott and Molnar solely to attempt to defeat federal jurisdiction, and not to pursue any claim against them.

---

[5]   The order with respect to this opinion was superseded by a subsequent more comprehensive order, but the underlying opinion was not superseded.

~ Doc# 514098.02 ~

17.

If the Court has any doubt that Mr. Scott or Mr. Molnar is fraudulently joined, it should permit discovery on the issue.

## Defendant Kaiser Is Fraudulently Joined

18.

The presence of Steven Kaiser as a defendant does not defeat removal because plaintiffs have no reasonable basis for a claim against Mr. Kaiser and no good faith intent to pursue a claim against him.

19.

Mr. Kaiser was an area business director for Wyeth from 1995 to 2001. In that capacity, Mr. Kaiser was responsible for managing nine district managers who, in turn, managed approximately 134 sales representatives, in the States of Georgia and Alabama. Kaiser Affidavit ¶ 2 and ¶ 8 (attached as Exhibit 13). Mr. Kaiser never had any direct contact with patients regarding Pondimin or Redux. Id. at ¶ 3. He has not discussed Pondimin or Redux with any physician since 1977, and before that with physicians in Indiana and Illinois. Id. at ¶ 4. He has never made a sales call to any physician to discuss Redux. Id. at ¶ 5 and ¶ 9. He was not involved with the design, manufacture, testing, or labeling of Pondimin or Redux. Id. at ¶ 6. He was not involved in the regulatory approval process for diet drugs. Id. Mr. Kaiser also was not involved in developing the advertising and

23

promotional materials for the sale of Pondimin or Redux, and did not direct or develop any of the training materials used by sales representatives.  Id. at ¶¶ 9-10.

Plaintiffs have no reasonable basis for a claim against Mr. Kaiser because he did not cause, and could not have caused, any injury to plaintiffs.  Only one of the plaintiffs even lives in a state in which Mr. Kaiser had any job responsibilities. None of the plaintiffs have any evidence that Mr. Kaiser supplied any of them or their doctors with any drugs, or that he ever had any communications with them or their doctors on which they relied.

Plaintiffs attempt to impose liability on Mr. Kaiser by alleging that he was responsible for, and participated in, the dissemination of false and misleading information about diet drugs.  That is not only contrary to the facts as set forth in Mr. Kaiser's affidavit, but also is exactly the type of generalized allegation that Judge Carnes held insufficient to state a reasonable basis for a claim against sales representatives.  James v. Parke-Davis, 1:00-CV-1203-JEC, slip op. at 17-21 (N.D. Ga. Nov. 30, 2000) (Exhibit 8) (allegation that defendant was involved in implementing deceptive "sales strategy" was not sufficient to avoid finding of fraudulent joinder).

Plaintiffs' fraud and conspiracy to defraud claims against Mr. Kaiser fail for the additional reason that plaintiffs fail to plead them with particularity.  See Fed.

24

the "district court did not intend to overlook <u>a feature critical to jurisdictional analysis</u>." <u>Id.</u> (emphasis added). The district court later remanded, stating that it considered and rejected the misjoinder argument. On a second petition for mandamus, the Fifth Circuit was constrained to deny relief because it no longer had jurisdiction. <u>In re Benjamin Moore & Co.</u>, 318 F.3d 626 (5th Cir. 2002). The Court stressed, however, that it was reaching that decision "without detracting from the force of the <u>Tapscott</u> principle that fraudulent misjoinder of plaintiffs is no more permissible than fraudulent misjoinder of defendants to circumvent diversity jurisdiction." <u>Id.</u> at 630-31. While the circumstances of <u>Benjamin Moore</u> did not permit the Fifth Circuit to grant mandamus, the Fifth Circuit made absolutely clear that the misjoinder of plaintiffs is not permitted.

In the diet drug litigation, the MDL Court has applied the <u>Tapscott</u> rule to hold that plaintiffs cannot defeat diversity jurisdiction over an action in its entirety when only some plaintiffs assert a claim against non-diverse defendants. <u>Anderson v. Am. Home Prods. Corp.</u>, 220 F. Supp. 2d 414, 422 (E.D. Pa. 2002) ("[w]e will therefore grant the motion to remand of plaintiffs Crystal Gatlin and Verna Brown and deny the motion of the remaining plaintiffs"); <u>Chaney v. Gate Pharms.</u>, No. Civ.A. 98-20478, 1999 WL 554584, at *4 (E.D. Pa. July 16, 1999) (retaining jurisdiction and "dismiss[ing] the non-diverse Plaintiffs' claims").

In re Rezulin Products Liability Litigation, 168 F. Supp. 2d 136, 148 (S.D.N.Y. 2001), presented a similar situation.  There, plaintiffs alleging claims only against drug manufacturers, as to which there would be complete diversity if asserted alone, were joined with a plaintiff who also asserted a claim against a non-diverse home health care provider.  The court ordered the severance of the latter plaintiff "for purposes of maintaining the defendants' right to removal of the remainder of the action."  Id. at 148.  In another circumstance, the same court considered the impact on removal of joining five plaintiffs suing a drug company and a non-diverse physician with four plaintiffs suing only the drug company.  The court recognized that there may be efficiency benefits to joinder, "but these benefits must be weighed against a defendant's right to removal."  Id.  Thus, the court determined that the proper remedy was to sever plaintiffs' claims "so as to preserve the defendants' right to removal" in the actions where there was diversity. Id.; see also In re Rezulin Prods. Liab. Litig., No. 00 CIV. 2843(LAK), 2002 WL 548750, at *2 (S.D.N.Y. Apr. 12, 2002) (severing claims of plaintiffs "who have no connection to each other aside from the fact that they ingested Rezulin"); In re Rezulin Prods. Liab. Litig., MDL No. 1348, 2002 WL 519743, at *1-2 (S.D.N.Y. Apr. 5, 2002); In re Rezulin Prods. Liab. Litig., MDL No. 1348, 2002 WL 313146, at *1 (S.D.N.Y. Feb. 27, 2002).

29

These decisions are consistent with the decisions of other courts. <u>See</u>, <u>e.g.</u>, <u>Lyons v. Am. Tobacco Co.</u>, No. Civ.A. 96-0881-BH-S, 1997 WL 809677, at *4 (S.D. Ala. Sept. 30, 1997) (denying remand where misjoinder of plaintiffs was a "transparent artifice to defeat ... diversity" and therefore constituted fraudulent joinder); <u>Koch v. PLM Int'l, Inc.</u>, No. Civ.A. 97-0177-BH-C, 1997 WL 907917, at *4 (S.D. Ala. Sept. 24, 1997) (same); <u>Coleman v. Conseco, Inc.</u>, 238 F. Supp. 2d 804, 817-19 (S.D. Miss. 2002) (finding forty-five out-of-state plaintiffs improperly attempted to defeat diversity by joining their claims with three in-state residents).

In pharmaceutical cases, courts have found that plaintiffs' failure to allege that they took the same drugs, for the same periods of time, as prescribed by the same doctors at the same point in time, and having received the same information about the drugs, supported the conclusion that plaintiffs were improperly joined. <u>Chaney</u>, 1999 WL 554584, at *3-*4 (claims of diet drug plaintiffs who did not take "the same drug or combinations of drugs" and who "have not purchased or received diet drugs from an identical source, such as a physician, hospital, or diet center," were misjoined); <u>In re Rezulin Prods. Liab. Litig.</u>, 168 F. Supp. 2d at 146 (plaintiffs who "do not allege that they received Rezulin from the same source or that they were exposed to Rezulin for similar periods of time" were misjoined); <u>Simmons v. Wyeth Labs.</u>, Nos. CIV.A.96-CV-6631, CIV.A.96-CV-6686,

CIV.A.96-CV-6728, CIV.A.96-CV-6730, 1996 WL 617492, at *4 (E.D. Pa. Oct. 24, 1996) (claims of plaintiffs misjoined, at least in the absence of evidence that they "received identical information from the defendants through identical means or sources at the same point in time, and were implanted with the drug by the same doctors at the same facility"); see also, e.g., In re Rezulin Prods. Liab. Litig., No. 00 CIV. 2843(LAK), 2002 WL 548750, at *2 (S.D.N.Y. Apr. 12, 2002) (reiterating that "the joinder of plaintiffs who have no connection to each other aside from the fact that they ingested Rezulin is misjoinder").[6]

The same factors exist here.  Because plaintiffs reside in different states, they obviously were prescribed diet drugs by different doctors, who had different bases of knowledge about the potential hazards of diet drugs and took different

---

[6] In Hodges v. Wyeth, Inc., No. 1:08-CV-276 (N.D. Ga. June 16, 2003) and Laurin v. Wyeth, Inc., No. 1:03-CV-1108-WBH (N.D. Ga. July 15, 2003), Judges Camp and Hunt found that diet drug plaintiffs were not misjoined with the only non-diverse plaintiff because that plaintiff's claims arose from the same series of transactions as the other plaintiffs' claims, but without discussing or even mentioning any of the diet drug and other pharmaceutical cases to the contrary cited in the text.  Judge Hunt cited no authority for so ruling.  Judge Camp cited Alexander v. Fulton, 207 F.3d 1303 (11th Cir. 2000), a case in which plaintiffs alleged a pattern and practice of racial discrimination by the same employer. Defendants respectfully submit that the nature of the claims and proof in this case is more akin to that in other diet drug and pharmaceutical cases than to employment discrimination cases, and that Judges Camp and Hunt erred.  The only other apparently inconsistent diet drug decisions turned on the application of Mississippi's joinder rules, which are irrelevant to this Georgia case removed to federal court.  See, e.g., Chrestman v. Am. Home Prods. Corp., No. 03-20097 (E.D. Pa. May 20, 2003).  This Court is bound to follow the Eleventh Circuit's holding in Tapscott, which applied federal joinder rules.  See Tapscott, 77 F.3d at 1360.

~ Doc# 514098.02 ~

factors into account in deciding whether and how to prescribe them.  Plaintiffs do not claim to have taken the same combination of drugs for the same periods of time.  Plaintiffs allege only that they took Redux, Pondimin, "and/or" phentermine. The fact that plaintiffs took the drugs at different times is important because the warnings accompanying the drug changed over time.  For these and other reasons, resolution of diet drug claims is highly dependent on facts unique to each diet drug plaintiff.  See Brown v. Am. Home Prods. Corp., No. 99-20593, slip op. at 9-39 (E.D. Pa. April 8, 2003) (attached as Exhibit 14) (plaintiffs claiming an intermediate opt out right under the Settlement Agreement prohibited from introducing generalized evidence concerning Wyeth's conduct on a variety of issues).  These facts, and the diet drug history described in Anderson, make plain that plaintiffs have improperly and egregiously misjoined non-diverse plaintiff claims for the purpose of defeating jurisdiction.

Some courts have required something more than mere misjoinder before severing claims, using different terms to describe what is necessary.  See, e.g., Tapscott, 77 F.3d at 1360 (referring to "egregiousness" of the misjoinder); Coleman, 238 F. Supp. 2d at 814 (misjoinder must be "totally unsupported, or egregious"); Chaney, 1999 WL 554584, at *3 (complaint went "well beyond mere misjoinder"); Koch, 1997 WL 907917, at *4 (noting case contained "the additional

32

element of collusive joinder to defeat the diversity jurisdiction"). Regardless of the specific terms used, these courts agreed that severance is appropriate when plaintiffs have misjoined their claims with the intent of destroying jurisdiction. Such intent can be inferred here. Here, there is no logical connection between plaintiffs' disparate claims, and plaintiffs have given no legitimate reason for joining them in one action. It is plain that they did so solely in an effort to defeat jurisdiction.

The Court should apply the above authorities to sever, and retain jurisdiction over, the claims of all plaintiffs other than Danielle Dono.

### This Case Satisfies The Other Requirements
### For Diversity Jurisdiction And Removal

24.

Based on the allegations and claims in the Complaint, the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is a civil action brought in a state court over which the United States District Court has original jurisdiction because there is both a diversity of citizenship between the properly joined parties and the amount in controversy meets the monetary requirements under 28 U.S.C. § 1332.

~ Doc# 514098.02 ~

25.

All properly joined and served defendants in this case consent to this Notice

of Removal.  See Exhibit B.  Wyeth is not required to obtain the consent of the

phentermine defendants or Indevus because they are fraudulently joined.  See, e.g.,

Stanger v. Am. Home Prods. Corp., Nos. 03-20086 and 03-20088, slip op. at 4-9

(E.D. Pa. May 29, 2003) (Exhibit 2); Anderson v. Am. Home Prods. Corp., 220 F.

Supp. 2d 414, 419-22, 425 (E.D. Pa. 2002).

26.

The pending action is one that may be removed to this Court, and this Notice

of Removal is filed pursuant to 28 U.S.C. § 1441 et seq.

27.

After the filing of this Notice of Removal, Petitioners will promptly give

notice thereof to Plaintiffs and will file a true and correct copy of this Notice of

Removal with the State Court of Fulton County, Georgia.

WHEREFORE, Petitioners pray that this Notice of Removal be filed; that

said action being Civil Action No. 2003VS053565 in the State Court of Fulton

County, Georgia be removed to this Court; that this Court sever, and retain

jurisdiction over, all claims asserted by all plaintiffs other than Danielle Dono; and

that no further proceedings be had with respect to those claims in the State Court of

Fulton County, Georgia.

34

Respectfully submitted this 30th day of July, 2003.

Stephen M. Lore
Georgia Bar No. 457845
Stephen M. Brooks
Georgia Bar No. 085151
Richard B. North
Georgia Bar No. 545549

NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Suite 1400
999 Peachtree Street, NE
Atlanta, GA 30309
(404) 817-6000
Fax (404) 817-6050

*Attorneys for Defendants Wyeth, Wyeth*
*Pharmaceuticals, Inc., Robert L. Scott,*
*John A. Molnar and Steven Kaiser*

35

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1D, counsel certifies by signing below that the foregoing has been prepared using Times New Roman 14 point font, one of the fonts specified in Local Rule 5.1B.

Stephen M. Lore
Georgia Bar No. 457845
Stephen M. Brooks
Georgia Bar No. 085151
Richard B. North
Georgia Bar No. 545549

NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Suite 1400
999 Peachtree Street, NE
Atlanta, GA 30309
(404) 817-6000
Fax (404) 817-6050

*Attorneys for Defendants Wyeth,
Wyeth Pharmaceuticals, Inc., Robert
L. Scott, John A. Molnar and Steven
Kaiser*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| ELLEN B. MCFARLAND; DANIELLE DONO; | ) | |
| AUGUSTUS B. RANDLE; RHONDA BAILEY; | ) | |
| RENELL BEACH; RICHARD H. BRYAN; | ) | |
| REBECCA BULLARD; ROBERT L. | ) | |
| CARMIGNANI; RICHARD A. COBB; | ) | CIVIL ACTION FILE |
| ROBERT COHAN; ROBERT G. COHEN; | ) | |
| RICHARD L. CONRAD; RODNEY DAVIS; | ) | NO. _____ |
| REGINA M. DUNSTER; REBECCA | ) | |
| ETHERTON; ROBERT M. FAIRFIELD; | ) | |
| RINDALEE FORSYTH; RICHARD FOWLER; | ) | |
| ROBERT. GRAY; ROBERT D. HELLYER; | ) | |
| ROBERT J. HERBOLICH; RENITA H. | ) | |
| HUNLEY; ROBERT L. JOLLEY; RICHARD | ) | |
| E. JUDD; ROBBIE R. KELL; RENEE M. | ) | |
| LONCKE; REGINA LOWMAN-CURBEAN; | ) | |
| ROBERT G. LUCE; ROBIN MACARTHUR; | ) | |
| ROBERT MCCLAMY; RITA M. MOORE; | ) | |
| RHONDA G. MULLINS; RICHARD D. NELL; | ) | |
| ROBERT E. NICHOLS; ROBERT NOVOTNY; | ) | |
| RICHARD F. ORLUK; REBECCA A. | ) | |
| PANTUSO; RICHARD N. PILANT; ROBERTA | ) | |
| RINALDI; RICHARD ROCHA; RHONDA | ) | |
| SAMPLE; REBECCA D. SCHULTZE; | ) | |
| RICHARD E. SCUTERI; REGINA STANLEY; | ) | |
| REGINA W. STEPHENS; REBECCA A. | ) | |
| TENA; ROBERT E. VANDERPOOL; | ) | |
| RICHARD WELDON; RHONDA WILMOT; | ) | |
| RENEE K. YANCEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |

WYETH, INC., f/k/a AMERICAN HOME )
PRODUCTS CORPORATION; WYETH )
PHARMACEUTICALS, INC., f/k/a WYETH- )
AYERST PHARMACEUTICALS, INC., a )
Division of American Home Products )
Corporation; INDEVUS )
PHARMACEUTICALS, INC., f/k/a )
INTERNEURON PHARMACEUTICALS, )
INC.; CELLTECH PHARMACEUTICALS, )
INC.; ROBERT L. SCOTT, a citizen of the State )
of Georgia; JOHN A. MOLNAR, a citizen of the )
State of Georgia; STEVEN KAISER, a citizen of )
the State of Georgia; and JOHN DOE NOS. 1 )
and 2, )
  )
                                 **Defendants.** )
  )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the within and foregoing

**NOTICE OF REMOVAL** by depositing a copy of same in the United States Mail

in a properly addressed envelope with sufficient postage affixed thereto to ensure

delivery to the following:

                         Robert C. Buck, Esq.
                         C. Andrew Childers, Esq.
                         Childers, Buck & Schlueter, LLP
                         Suite 1601
                         260 Peachtree Street
                         Atlanta, GA 30303

~ Doc# 514098.02 ~

Charles A. Mathis, Jr., Esq.
The Mathis Law Firm
The Equitable Building
Suite 1400
100 Peachtreet Street, N.W.
Atlanta, GA 30303

Attorneys for Plaintiffs

Lori G. Baer, Esq.
Clifton M. Iler, Esq.
Laura Johnson, Esq.
Alston & Bird, LLP
One Atlanta Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

Attorneys for Medeva Pharmaceuticals Inc. and CellTech
Pharmaceuticals, Inc.

M. Elizabeth O'Neill, Esq.
Hawkins & Parnell, LLP
4000 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA  30308-3243

Attorneys for Indevus Pharmaceuticals, Inc., f/k/a
Interneuron Pharmaceuticals

3

This _30th_ day of July, 2003.

Stephen M. Lore
Georgia Bar No. 457845
Stephen M. Brooks
Georgia Bar No. 085151
Richard B. North
Georgia Bar No. 545549

*Attorneys for Defendants Wyeth, Wyeth*
*Pharmaceuticals, Inc., Robert L. Scott,*
*John A. Molnar and Steven Kaiser*

NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Suite 1400
999 Peachtree Street, NE
Atlanta, GA 30309
(404) 817-6000
Fax (404) 817-6050

~ Doc# 514098.02 ~



EXHIBIT/ ATTACHMENT



(To be scanned in place of tab)

\*\*\*EFILED\*\*\*
LexisNexis FilingID: 1961570
Date:  Jun 30 2003  9:50AM
Stefani Searcy, Clerk

IN THE STATE COURT OF FULTON COUN
STATE OF GEORGIA

ELLEN B. MCFARLAND, DANIELLE DONO,
AUGUSTUS B. RANDLE, RHONDA BAILEY,
RENELL BEACH, RICHARD H BRYAN,
REBECCA BULLARD, ROBERT L
CARMIGNANI, RICHARD A. COBB, ROBERT
COHAN, ROBERT G. COHEN, RICHARD L
CONRAD, RODNEY DAVIS, REGINA M
DUNSTER, REBECCA ETHERTON, ROBERT M
FAIRFIELD, RINDALEE FORSYTH, RICHARD
FOWLER, ROBERT GRAY, ROBERT D.
HELLYER, ROBERT J HERBOLICH, RENITA H
HUNLEY, ROBERT L JOLLEY, RICHARD E.
JUDD, ROBBIE R KELL, RENEE M LONCKE,
REGINA LOWMAN-CURBEAN, ROBERT G
LUCE, ROBIN MACARTHUR, ROBERT
MCCLAMY, RITA M MOORE, RHONDA G
MULLINS, RICHARD D NELL, ROBERT E
NICHOLS, ROBERT NOVOTNY, RICHARD F
ORLUK, REBECCA A PANTUSO, RICHARD N.
PILANT, ROBERTA RINALDI, RICHARD
ROCHA, RHONDA SAMPLE, REBECCA D
SCHULTZE, RICHARD E. SCUTERI, REGINA
STANLEY, REGINA W STEPHENS, REBECCA
A. TENA, ROBERT E VANDERPOOL, RICHARD
WELDON, RHONDA WILMOT, RENEE K.
YANCEY,

       Plaintiffs,

vs.

WYETH, INC., f/k/a AMERICAN HOME
PRODUCTS CORPORATION;
WYETH PHARMACEUTICALS, INC f/k/a
WYETH-AYERST PHARMACEUTICALS,
INC., a Division of American Home Products
Corporation; INDEVUS
PHARMACEUTICALS, INC., f/k/a
INTERNEURON PHARMACEUTICALS, INC.;
CELLTECH PHARMACEUTICALS, INC.;
ROBERT L. SCOTT, a citizen of the State of
Georgia; JOHN A. MOLNAR, a citizen of the
State of Georgia; STEVEN KAISER a citizen of
the State of Georgia; and JOHN DOE NOS. 1
and 2,

       Defendants.

CIVIL ACTION FILE

NO.

**COMPLAINT FOR DAMAGES**

1.      COME NOW, Plaintiffs **Ellen B. McFarland, Danielle   Dono, Augustus B. Randle,**
**Rhonda   Bailey, Renell   Beach, Richard H Bryan, Rebecca   Bullard, Robert L Carmignani,**
**Richard A. Cobb, Robert   Cohan, Robert G. Cohen, Richard L Conrad, Rodney   Davis, Regina**
**M Dunster, Rebecca   Etherton, Robert M Fairfield, Rindalee   Forsyth, Richard   Fowler,**
**Robert   Gray, Robert D. Hellyer, Robert J Herbolich, Renita H Hunley, Robert L Jolley,**
**Richard E. Judd, Robbie R Kell, Renee M Loncke, Regina   Lowman-Curbean, Robert G Luce,**
**Robin   MacArthur, Robert   McClamy, Rita M Moore, Rhonda G Mullins, Richard D Nell,**
**Robert E Nichols, Robert   Novotny, Richard F Orluk, Rebecca A Pantuso, Richard N. Pilant,**
**Roberta   Rinaldi, Richard   Rocha, Rhonda   Sample, Rebecca D Schultze, Richard E. Scuteri,**
**Regina   Stanley, Regina W Stephens, Rebecca A. Tena, Robert E Vanderpool, Richard**
**Weldon, Rhonda   Wilmot, Renee K. Yancey,** and set forth their Complaint for Damages against
Defendants as follows:

   a. Plaintiff **Ellen B. McFarland** is a citizen and resident of the State of Georgia suffering
      from heart valve damage and/or valvular regurgitation as a result of his/her ingestion,
      consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or
      phentermine.

   b. Plaintiff **Danielle   Dono** is a citizen and resident of the State of New Jersey suffering
      from heart valve damage and/or valvular regurgitation as a result of his/her ingestion,
      consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or
      phentermine.

   c. Plaintiff **Augustus B. Randle** is a citizen and resident of the State of Tennessee suffering
      from heart valve damage and/or valvular regurgitation as a result of his/her ingestion,
      consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or
      phentermine.

   d. Plaintiff **Rhonda   Bailey** is a citizen and resident of the State of Kansas suffering from
      heart valve damage and/or valvular regurgitation as a result of his/her ingestion,

k. Plaintiff **Robert G. Cohen** is a citizen and resident of the State of Ohio suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

l. Plaintiff **Richard L Conrad** is a citizen and resident of the State of Nevada suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

m. Plaintiff **Rodney Davis** is a citizen and resident of the State of Virginia suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

n. Plaintiff **Regina M Dunster** is a citizen and resident of the State of Virginia suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

o. Plaintiff **Rebecca Etherton** is a citizen and resident of the State of Kansas suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

p. Plaintiff **Robert M Fairfield** is a citizen and resident of the State of Massachusetts suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

q. Plaintiff **Rindalee Forsyth** is a citizen and resident of the State of Kansas suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion,

consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

r.   Plaintiff **Richard  Fowler** is a citizen and resident of the State of Virginia suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

s.   Plaintiff **Robert  Gray** is a citizen and resident of the State of Connecticut suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

t.   Plaintiff **Robert D. Hellyer** is a citizen and resident of the State of Virginia suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

u.   Plaintiff **Robert J Herbolich** is a citizen and resident of the State of Ohio suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

v.   Plaintiff **Renita H Hunley** is a citizen and resident of the State of Virginia suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

w.  Plaintiff **Robert L Jolley** is a citizen and resident of the State of Virginia suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

x.  Plaintiff **Richard E. Judd** is a citizen and resident of the State of Virginia *suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.*

y.  *Plaintiff* **Robbie R Kell** *is a citizen and resident of the State of Nevada suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.*

z.  Plaintiff **Renee M Loncke** is a citizen and resident of the State of Nebraska *suffering from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.*

aa. *Plaintiff* **Regina  Lowman-Curbean** is a citizen and resident of the State of Maryland suffering from heart valve damage and/or valvular regurgitation as a *result of his/her ingestion, consumption and use of* fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.

bb. Plaintiff **Robert G Luce** is a citizen and resident of the State of Massachusetts suffering *from heart valve damage and/or valvular regurgitation as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.*

cc. Plaintiff **Robin  MacArthur** is a citizen and resident of the State of Maryland suffering from heart valve damage and/or valvular regurgitation *as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine.*

dd. Plaintiff **Robert  McClamy** is a citizen and *resident of the State of* Maryland suffering *from heart valve damage and/or valvular regurgitation as a result of his/her ingestion,*

"WYETH PHARMACUETICALS."

24.    Defendant WYETH PHARMACEUTICALS may be served with a copy of summons and complaint through the Georgia Secretary of State and/or at its principal place of business, 555 Lancaster Avenue, St. Davids, Pennsylvania 19087.

25.    Defendant WYETH PHARMACEUTICALS is subject to the jurisdiction and venue of this court.

26.    Defendant, INDEVUS PHARMACEUTICALS, INC. (formerly known as INTERNEURON PHARMACEUTICALS, INC.) (hereinafter "INTERNEURON" or "Manufacturer Defendant"), has its principal place of business at One Ledgemont Center, 99 Hayden Avenue, Lexington, Massachusetts. Defendant Interneuron is incorporated under the laws of the State of Delaware. At all times relevant hereto, Interneuron was engaged in the business of manufacturing, distributing, promoting, marketing, and/or selling the pharmaceutical dexfenfluramine. At all times relevant hereto, Interneuron developed, manufactured, promoted, marketed, and/or sold its products through interstate commerce and in the State of Georgia, and otherwise did business in Georgia related to this cause. Defendant Interneuron is not registered with the Georgia Secretary of State as an entity properly qualified to transact business within the State.

27.    On April 2, 2002 INTERNEURON PHARMACEUTICALS, INC. changed its name to "INDEVUS PHARMACEUTICALS."

28.    The National Settlement does not relate to, nor place any limitations upon, the claims asserted by Plaintiffs against Defendant Interneuron.

29.    Defendant Interneuron may be served with a copy of summons and complaint, through the Georgia Secretary of State and/or at its principal place of business, One Ledgemont Center, Suite 200, 99 Hayden Avenue, Lexington, Massachusetts, 02173.

30.    Defendant Interneuron is subject to the jurisdiction and venue of this court.

31.    Defendant, CELLTECH PHARMACEUTICALS, INC. (hereinafter "CELLTECH" or "Manufacturer Defendant"), has its principal place of business at 755 Jefferson Road, Rochester,

NY 14603. Defendant CELLTECH is incorporated under the laws of the State of Delaware. Prior to the filing of the present action, CELLTECH entered into a series of mergers and acquisitions, as a result of which, it now serves as the successor in interest to Defendant MEDEVA PHARMACEUTICALS, INC.. Defendant CELLTECH is liable to Plaintiffs for the obligations and liabilities of Defendant MEDEVA as their successor in interest.  At all times relevant hereto, MEDEVA was engaged in the business of manufacturing, distributing, promoting, marketing, and/or selling the pharmaceutical phentermine.   At all times relevant hereto, MEDEVA developed, manufactured, promoted, marketed, and/or sold its products through interstate commerce and in the State of Georgia, and otherwise did business in Georgia related to this cause.

32.     The National Settlement does not relate to, nor place any limitations upon, the claims asserted by Plaintiffs against Defendant CELLTECH.

33.     Defendant CELLTECH may be served with a copy of summons and complaint through its registered agent for service of process, C.T. Corporation System at 1201 Peachtree Street, Atlanta, Fulton County, State of Georgia, 30361.

34.     Defendant CELLTECH is subject to the jurisdiction and venue of this court.

35.     Defendant **ROBERT L. SCOTT** (hereinafter Defendant Scott or "AHP/WYETH Defendant" is a citizen of the State of Georgia residing at 660 St. Regis Lane, Alpharetta, Fulton County, State of Georgia.  At all times relevant to the allegations set forth under this Complaint Defendant Scott was employed by Defendant Wyeth-Ayerst, its predecessor in interest, Lederle, and/or Defendant AHP/WYETH.

36.     Defendant Scott assisted Wyeth-Ayerst, Lederle and AHP/WYETH, as well as the other Defendants, in the promotion, marketing, and sale of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine throughout portions of the United States, including but not limited to, the state(s) in which Plaintiffs obtained or ingested the subject drug products.

37.     Defendant Scott affirmatively undertook to provide materially false and misleading

information relating to the safety and efficacy of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine to various state medical boards, state pharmacy boards, and state regulatory entities for the specific purpose of increasing the availability and sale of the subject drug products to Plaintiffs and the general public by lobbying for the removal of restrictions on the consumption and sale of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine in the subject states.

38.     Defendant Scott, in his capacity as State Government Affairs Manager for various defendants, was responsible for obtaining of government approval for the pharmaceutical drugs phentermine hydrochloride, fenfluramine hydrochloride and/or dexfenfluramine hydrochloride so as to permit their distribution, sale and consumption in the United States of America.

39.     Defendant Scott was also involved in a conspiracy with the named Defendants to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to Plaintiffs.

40.     Defendant Scott may be served with a copy of summons and complaint at his residence located at 660 St. Regis Lane, Alpharetta, Fulton County, State of Georgia 30022.

41.     Defendant Scott is subject to the jurisdiction and venue of this court.

42.     Defendant JOHN ("JACK") A. MOLNAR (hereinafter "Defendant Molnar" or "AHP/WYETH Defendant") is a citizen of the State of Georgia residing at 740 Winston Drive, Lawrenceville, Gwinnett County, State of Georgia. At all times relevant to the allegations set forth under this Complaint, Defendant Molnar was employed by Defendant Wyeth-Ayerst, its predecessor in interest, Lederle, and/or Defendant AHP/WYETH.

43.     Defendant Molnar assisted Wyeth-Ayerst, Lederle and AHP/WYETH, as well as the other Defendants, in the promotion, marketing, and sale of fenfluramine (Pondimin®), dexfenfluramine (Redux®), and phentermine throughout portions of the United States, including but not limited to, the state(s) in which Plaintiffs obtained or ingested the subject drug products.

44.     Defendant Molnar affirmatively undertook to provide materially false and misleading

information relating to the safety and efficacy of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine to various state medical boards, state pharmacy boards, and state regulatory entities for the specific purpose of increasing the availability and sale of the subject drug products to Plaintiffs and the general public by lobbying for the removal of restrictions on the consumption and sale of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine in the subject states.

45.     Prior to May 20, 1997, all Tennessee physicians (including the physician(s) who prescribed the subject diet drugs to each Tennessee Plaintiff identified herein above) were precluded by law from prescribing Pondimin, Redux, and phentermine to their patients.

46.     On May 20, 1997, Tennessee State Senate Bill No. 1343, which lifted the ban on prescribing of Pondimin, Redux, and phentermine by Tennessee physicians (including the physician(s) who prescribed the subject diet drugs to each Tennessee Plaintiff identified herein above), was signed into law by Tennessee Governor Don Sunquist.

47.     In addition to lifting the ban on prescribing of Pondimin, Redux, and phentermine by Tennessee physicians, Tennessee State Senate Bill No. 1343 also effectively prevented the Tennessee Board of Medical Examiners from promulgating rules to limit physicians' (including the physician(s) who prescribed the subject diet drugs to each Tennessee Plaintiff identified herein above) abilities to prescribe Pondimin, Redux, and phentermine, except where the patient being treated for obesity was under eighteen (18) years of age.

48.     Prior to the passage of Tennessee State Senate Bill No. 1343, Defendant Molnar petitioned the Tennessee Board of Medical Examiners and the Tennessee legislature to give Tennessee physicians (including the physician(s) who prescribed the subject diet drugs to each Tennessee Plaintiff identified herein above) the ability to prescribe Pondimin, Redux, and phentermine.

49.     Defendant Molnar's efforts to have the ban on prescribing Pondimin, Redux, and phentermine in Tennessee lifted were successful with the enactment of Tennessee State Senate

Bill 1343.

50. According to a May 28, 1997 Wyeth memorandum, the passage of the Tennessee State Senate Bill lifting the ban on prescribing of Pondimin, Redux, and phentermine by Tennessee physicians (including the physician(s) who prescribed the subject diet drugs to each Tennessee Plaintiff identified herein above), was possible only through the excellent work and efforts of Defendant Molnar and one other individual, with assistance from Wyeth's Tennessee sales force.

51. The passage of Tennessee State Senate Bill No. 1343 was the direct result of material misrepresentations made by Defendant Molar to Tennessee legislators, physicians, and citizens relating to the safety and efficacy of Pondimin, Redux, and phentermine.

52. But for the passage of Tennessee State Senate Bill No. 1343, Plaintiffs from Tennessee in this action, would never have been prescribed Pondimin, Redux, and/or phentermine.

53. Defendant Molnar was further responsible for obtaining governmental approval for the pharmaceutical drugs phentermine hydrochloride, fenfluramine hydrochloride (Pondimin) and/or dexfenfluramine hydrochloride (Redux) so as to permit their distribution, sale and consumption in the United States of America.

54. Defendant Molnar was also involved in a conspiracy with the named Defendants to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to Plaintiffs.

55. Defendant Molnar may be served with a copy of summons and complaint at his residence located at 740 Winston Drive, Lawrenceville, Gwinnett County, State of Georgia 30044.

56. Defendant Molnar is subject to the jurisdiction and venue of this court.

57. Defendant STEVEN KAISER (hereinafter "Defendant Kaiser", "Sales Director Defendant", or "AHP/WYETH Defendant") is a citizen of the State of Georgia residing at 595 Danas Ridge Drive, Roswell, Fulton County, State of Georgia. At all times material hereto, this Defendant was in the business of promoting, marketing, developing, selling and/or distributing the pharmaceutical drugs phentermine, fenfluramine and/or dexfenfluramine in the States of

Georgia, and Alabama, as well as other states in the southeastern United States. This Defendant was responsible for and participated in the dissemination of false and misleading information, including but not limited to safety and associated risks, regarding the pharmaceutical drugs phentermine, fenfluramine and/or dexfenfluramine to physicians in the States of Georgia and Alabama, as well as other states in the southeastern United States, including the physician(s) of each Georgia and Alabama Plaintiff identified hereinabove. Said Plaintiffs' physicians relied upon this Defendant's false and misleading representations in prescribing phentermine, fenfluramine and/or dexfenfluramine to each such Plaintiff, as well as other patients. This Defendant was also involved in a conspiracy to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to Plaintiffs.

58.    Defendant Kaiser was also involved in a conspiracy to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to Plaintiffs.

59.    Defendant Steven Kaiser may be served with a copy of summons and complaint at 595 Danas Ridge Drive, Roswell, Fulton County, State of Georgia 30075.

60.    Defendant Kaiser is subject to the jurisdiction and venue of this court.

61.    Defendants JOHN DOE NOS. 1-2 are two separate persons, firms and/or corporations, who are believed to be citizens of the State of Georgia whose identities are otherwise unknown at this time.    At all times material hereto, said Defendants were in the business of promoting, marketing, developing, selling and/or distributing the pharmaceutical drugs phentermine, fenfluramine and/or dexfenfluramine. The John Doe Defendants were also involved in a conspiracy to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to, Plaintiffs.

62.    Once the identities and whereabouts of each John Doe Defendant is established, said Defendants will be served with a copy of summons and complaint as provided by law.

63.     The John Doe Defendants are subject to the jurisdiction and venue of this court.

## General Allegations

64.     The drugs, fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine were widely sold, distributed, promoted and advertised by the named Defendants, and various fictitious party Defendants, as effective weight control products. Defendants sold and distributed the subject drugs in Georgia as well as other states and placed said drugs into the stream of commerce knowing that they would enter the state(s) in which Plaintiffs resided and be consumed therein.

65.     Fenfluramine was one of the drugs prescribed in combination and promoted and referred to as "fen/phen." The AHP/WYETH Defendants marketed fenfluramine under the trade name, Pondimin. In doing so, the AHP/WYETH Defendants actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine because they knew that the combined use would increase sales of fenfluramine.

66.     The named Defendants, as well as the fictitious party Defendants, directly or indirectly, made, created, manufactured, assembled, designed, sterilized, tested, evaluated, labeled, supplied, packaged, marketed, advertised, warranted, distributed and/or sold the drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine. These same Defendants assisted in, and had control over, the design, assembly, packaging, labeling, marketing, advertising, manufacturing distribution and sale of the drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine.

67.     At all times material hereto, all Defendants, including the fictitious party Defendants, either knew or should have known that the drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine had been related to and associated with severe and life threatening complications.

68.     In 1965, the diet drug Aminorex was introduced in Europe. Aminorex was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting reuptake of

serotonin.  However, by 1967 evidence began to surface that the ingestion of Aminorex was associated with pulmonary hypertension.  Over the next six years, an Aminorex epidemic raged in Europe.  There was a ten-fold increase in primary pulmonary hypertension cases.  Half of the patients died within ten years and the rest of the patients suffered significant oxygen deprivation and are debilitated for the remainder of their lives.  Aminorex was removed from the European market in 1972.  The AHP/WYETH Defendants knew, or should have known, of the European experience with Aminorex and how it would relate to AHP/WYETH's drugs Pondimin® and Redux™ three (3) decades later.

69.    In 1973, Pondimin was introduced into the United States market.  Pondimin® is a fenfluramine drug and is in the same family of drugs as Aminorex, and is very similar to Aminorex.  Pondimin® was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting reuptake of serotonin.  However, because the drug when used alone made users lethargic and tired, sales of Pondimin languished.

70.    In the year 1990, the Food and Drug Administration (FDA) approved fenfluramine for use as a weight reduction drug for the short-term medical management of obesity.  Since that time, fenfluramine has been increasingly prescribed and used in combination with the drug phentermine to maximize weight loss.  This combination is commonly known as "fen-phen."

71.    The AHP/WYETH Defendants actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine and phentermine because they knew that the combined use would increase sales of fenfluramine.

72.    The "phen" portion of "fen-phen" consists of phentermine, an amphetamine which helps the body burn calories faster and which serves to counteract the drowsiness caused by the "fen" portion of the dosage consisting of fenfluramine, a drug which affected the serotonin levels in the brain.  Despite the fact that the concomitant use of fenfluramine and phentermine was never approved by the FDA, the subject drugs were widely prescribed for use in combination with each other and/or with dexfenfluramine in place of fenfluramine, as promoters of weight loss.

73.     Dexfenfluramine is the *d*-isomer of fenfluramine, containing essentially the same active ingredient as fenfluramine. The AHP/WYETH Defendants marketed dexfenfluramine under the trade name Redux™.

74.     The AHP/WYETH Defendants have known the serious side effects of fenfluramine and/or dexfenfluramine for a substantial period of time. These side effects were known or should have been known to all Defendants at the time that they marketed the drugs to the public based on, among other things, medical evidence of dangerous and potentially fatal side effects from the use of the drugs in Europe and elsewhere, as detailed below. Defendants did not, however, conduct adequate testing to establish the safety of the drugs before marketing them. Rather, the Defendants marketed the drugs and promoted their use, both individually and in combination with other drugs, while downplaying evidence of the serious and potentially fatal side effects that consumers of these drugs could face.

75.     Defendants undertook a marketing strategy which included advertising and promotional campaigns to aggressively promote and sell the subject drugs by falsely misleading potential users about the products, by suppressing material facts, and by failing to warn users about the serious health effects which Defendants knew or should have known could result from the use of the subject drugs.

76.     This advertising campaign on the whole, through its affirmative misrepresentations and omissions, falsely and fraudulently sought to create the impression and to convey to Plaintiffs and others on whom Plaintiffs would rely, that the use of either fenfluramine or dexfenfluramine alone or in combination with phentermine as "fen-phen" was safe and had fewer adverse health and side effects than was actually known to Defendants at the time they made these representations.

77.     Phentermine, fenfluramine and dexfenfluramine were aggressively marketed by Defendants, often by encouraging unapproved off-label combination use of the products.

78.     Defendants, as manufacturers and distributors, or agents thereof, knew of and recklessly

fenfluramine and/or dexfenfluramine, including the following: a) The presence of adequate testing of fenfluramine and the presence of adequate testing of any combination use of the product with phentermine; b) Fenfluramine and/or dexfenfluramine's efficacy including but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs; and c) The relative risks associated with the drugs including the prevalence of pulmonary hypertension and primary pulmonary hypertension.

85.     On October 3, 1981, Dr. J.G. Douglas published *Pulmonary Hypertension and Fenfluramine* in the British Medical Journal.  On January 25, 1986 an article entitled *Irreversible Pulmonary Hypertension after Treatment with Fenfluramine*, was published in the British Medical Journal.   The AHP/WYETH Defendants knew, or should have known, of the British Medical Journal articles and how those articles related to their drug Pondimin® a decade later.

86.     In 1984, Dr. Michael Weintraub published *A Double-Blind Clinical Trial in Weight Control: Use of Fenfluramine and Phentermine Alone and in Combination* in the Archives of Internal Medicine.  Dr. Weintraub's study was supported by A.H. Robins (which was later acquired by AHP/WYETH).  Despite noting some adverse effects associated with fenfluramine, Dr. Weintraub entirely failed to examine the long-term safety of fenfluramine.  Instead, the study focused on the short-term effectiveness of the drugs used individually, and in combination.

87.     In 1992, Dr. Weintraub published a series of articles in Clinical Pharmacological Therapies, in which he reported his research regarding the long term use of fenfluramine and phentermine for weight control.  Dr. Weintraub's research was supported by the AHP/WYETH Defendants.

88.     Dr. Weintraub's research assumed the safety of fenfluramine, and did not examine the short-term or long-term safety of the drug.  Further, the AHP/WYETH Defendants failed to conduct or fund any studies or research regarding the long-term safety of the fenfluramine drug, Pondimin.  Nevertheless, the AHP/WYETH Defendants did promote to physicians and the public Dr. Weintraub's conclusion that long term combination use of fenfluramine and phentermine

was effective for the management of obesity.

89.    By 1993, the AHP/WYETH Defendants labeling for Pondimin® indicated that there were only 4 reported cases of pulmonary hypertension reported in association with the drug. Yet, that same year, Dr. Francois Brenot published *Primary Pulmonary Hypertension and Fenfluramine Use*, in the British Heart Journal. Dr. Brenot identified 25 cases of primary pulmonary hypertension associated with the use of fenfluramine and/or dexfenfluramine. The AHP/WYETH Defendants knew or should have known of the Brenot article. AHP/WYETH should have known by at least 1993 that Pondimin® was defective and unreasonably dangerous. AHP/WYETH should have known by at least 1993 that AHP/WYETH's labeling of Pondimin® was false.

90.    On June 24, 1994, AHP/WYETH Safety Surveillance Monitor, Amy Myers, wrote a memo to AHP Medical Monitor, Fred Wilson, and indicated that AHP/WYETH's database contained 37 cases of primary pulmonary hypertension associated with Pondimin®. Further, in February 1994, the preliminary results of the International Primary Pulmonary Hypertension study ("IPPH Study") entitled "Appetite Suppressants and the Risk of Primary Pulmonary Hypertension" was released and available to the AHP/WYETH Defendants. The preliminary results of the IPPH Study confirmed the association between fenfluramine and dexfenfluramine, and pulmonary hypertension and primary pulmonary hypertension. The AHP/WYETH Defendants concealed the number of cases of primary pulmonary hypertension associated with Pondimin® that the AHP/WYETH Defendants knew existed in order to continue to market Pondimin® for profit.

91.    On June 15, 1995 AHP/WYETH Defendants' James Ottinger, reported to Joseph Bathish the status of the European Committee on Proprietary Medicinal Product's ("CPMP") pharmacovigilance discussion wherein the CPMP working party concluded that a causal relationship between anorectic agents, like fenfluramine and/or dexfenfluramine, and the occurrence of primary pulmonary hypertension had been established.

92.    The August 26, 1996 issue of the New England Journal of Medicine reported the final results of IPPH Study, which had been preliminarily released in February 1994.  The IPPH Study concluded that fenfluramine-based anorexigens, such as fenfluramine and dexfenfluramine, increased the risk of PPH by a multiple of more than 23 times.

93.    The AHP/WYETH Defendants were aware of the result of the IPPH study by at least February 1994.  Nevertheless, the AHP/WYETH Defendants failed to apprise the public or physicians that the risk of contracting PH or PPH was many, many multiples of that previously reported by the AHP in their literature.  Even after the Brenot article and the preliminary release of the IPPH Study the AHP/WYETH Defendants failed to remove Pondimin® from the market when the AHP/WYETH Defendants knew of the extreme danger, causal relationship and substantial risk of harm associated with the use AHP's drug Pondimin.

94.    Even prior to their knowledge of the IPPH Study, the manufacturers and distributors of the subject drugs knew about the risks of PPH associated with using the subject drugs from experience with and subsequent banning of such drugs in various countries in Europe.  Nevertheless, Defendants failed to apprise Plaintiffs, the public at large, or physicians of these material facts and risks.

95.    The AHP/WYETH Defendants continued to promote Pondimin after learning of the extreme danger associated with it.   The AHP/WYETH Defendants continued to promote Pondimin knowing the drug had no beneficial use.  The AHP/WYETH Defendants labeling on the drug was totally inadequate to alert prescribing physicians and patients of the actual PH or PPH danger and risk associated with its fenfluramine drug, Pondimin.

96.    Even after they knew of the danger the AHP/WYETH Defendants did not remove Pondimin from the market and did not do any further testing of the drug.   Instead, the AHP/WYETH Defendants continued to market the drug to prescribing physicians like the physicians that prescribed the diet drugs to the Plaintiffs in this case.

97.    Further, in 1996 the AHP/WYETH Defendants introduced their dexfenfluramine drug,

Redux™ into the U.S. market despite the fact that the AHP/WYETH Defendants knew of the danger and risks of primary pulmonary hypertension associated with Pondimin®.

98.     The AHP/WYETH Defendants did not adequately or appropriately disclose fenfluramine and/or dexfenfluramine information or related drug information to physicians in the United States. Instead the AHP/WYETH Defendants concealed the pulmonary hypertension (PH) or primary pulmonary hypertension (PPH) danger they knew of from physicians. As a result, physicians have over-prescribed fenfluramine and/or dexfenfluramine drugs, Pondimin® and Redux™, to patients who were under-informed regarding the risk of PH or PPH associated with the drugs.

99.     Although the FDA approved phentermine and fenfluramine separately, the FDA never approved the drugs for combined use. The AHP/WYETH Defendants knew of and encouraged the prevalence of off-label combined use of their drugs, and failed to adequately and appropriately warn physicians and consumers that the combination drug regimen was not FDA approved, was hazardous due to the presence of fenfluramine, was not recommended and had not been systematically tested by appropriate clinical trials. Further, the AHP/WYETH Defendants fraudulently removed written evidence supporting the association between PH and/or PPH with fenfluramine and/or dexfenfluramine.

100.    The AHP/WYETH Defendants failed to fully and adequately warn doctors, the public and/or the Plaintiffs about the risk of pulmonary hypertension and primary pulmonary hypertension from Pondimin® and Redux™.

101.    At all times relevant to this cause, Defendants also knew or should have known of many other studies, regulatory actions and concerns, incidences of injury and/or death, concerns about the subject drugs, safety among scientists, researchers, regulators and other knowledgeable professionals, the dangers of drug combinations, meetings among pharmaceutical industry officers, executives or employees (including Defendants), internal memos and reports of health concerns regarding the subject drugs, the desire of Defendants to stop or delay regulatory action

regarding the subject drugs, the lack of sufficient safety studies before and during marketing of the subject drugs, the contents of Defendants' own files, plans and reports, the danger of the off-label use of medications, safety concerns about the drugs which could block or change FDA approval, regulatory actions, reports of injury and concerns about the subject drugs in Europe, case reports of pulmonary hypertension, regulatory efforts to make changes in the warning and labels required on these products and the plans and actions of Defendants to fight such changes (including supplying regulators with false or misleading information), warning labels on the products designed so that they would be overlooked by physicians and users such as Plaintiffs, statements by medical professionals regarding safety concerns for the subject drugs, the fact that phentermine is an MOAI drug which would be contra-indicated for usage with fenfluramine and dexfenfluramine, prevalent usage of unsafe combinations of the subject drugs (as promoted by Defendants) and adverse effects reported there from, the failure of Defendants to report incidences of PPH resulting from the use of the subject drugs to regulators and health care professionals, false information provided by sales representatives and others concerned with advertising and promoting the subject drugs, efforts to derail regulatory review and oversight of the subject drugs, the identification of groups most at risk of injury, the misrepresentation and concealment of reports regarding adverse health effect of the subject drugs by Defendants from regulators and health care professionals, and many other material facts regarding the subject drugs and which would have shown the danger and adverse health effect of using the subject drugs. Nevertheless, Defendants did suppress, misrepresent and failed to inform Plaintiffs, the public at large, or physicians of these material facts and risks, and did encourage and promote unsafe usage by Plaintiffs and others.

102.    Defendants, having undertaken the manufacture, sale, marketing, distribution and promotion of the diet drugs described herein owed a duty to provide Plaintiffs, physicians, state regulators and others upon whom it was known, or should have known, by Defendants that Plaintiffs would rely, accurate and complete information regarding the subject drug products.

Nevertheless, Defendants misrepresented these facts, and failed to inform and did conceal from Plaintiffs, the public at large, and physicians of the material facts and risks of using the subject drugs.

103. Defendants fraudulently represented to Plaintiffs, Plaintiffs' physicians, state regulators and others upon whom it was known, or should have been known that each Plaintiff would rely, that the subject drugs were safe and effective, that the benefits of taking the subject drugs outweighed any risks and misrepresented and concealed safety and effectiveness information regarding its products including but not limited to the propensity to cause serious physical harm when used alone and in combination. The continuous and ongoing course of action constituting fraud and misrepresentation upon Plaintiffs started as early as 1993, if not earlier, and continued through repeated acts and non-disclosure every year since then, in the State(s) in which the Plaintiffs reside, throughout the United States, and elsewhere.

104. Defendants' fraudulent misrepresentations took the form of, among other forms, express and implied statements, publicly disseminated misinformation, misinformation provided to state regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information regarding the products while having a duty to disclose to Plaintiffs and others such information, and elaborate marketing, promotional, and advertising activities designed to conceal and mislead regarding the safety of the subject products.

105. The subject drug products were in fact unsafe, and the use of the subject drug products posed a risk of injury and death that outweighed the purported benefits of their use, such that injury was in fact caused to Plaintiffs and others.

106. Defendants failed to adequately warn Plaintiffs and those whom they knew Plaintiffs would rely of the hazards associated with the use of the subject diet drug products and conspired to conceal and did conceal this knowledge from Plaintiffs and others. As a result of this failure to warn, Plaintiffs were caused to suffer the injuries and damages hereinafter set forth.

107.    Plaintiffs were prescribed and/or ingested the drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine for weight loss and suffered injury thereby.

108.    Although Defendants knew or should have known that dangerous risks were associated with the use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine, Defendants proceeded to or permitted the same to be advertised, promoted, distributed and sold without adequate warnings of the serious side effects and dangerous risks. Defendants knew of and encouraged the prevalence of off-label combination use of their drugs and failed to warn physicians and consumers that the combination drug regimen was not FDA approved, was not recommended and had not been tested by appropriate clinical trials.

109.    The drugs fenfluramine, dexfenfluramine and phentermine were defective and unreasonably dangerous when they left the possession of Defendants in that, among other ways:

    a.  the subject drugs caused injury to the user far beyond any warned, noticed, expected or reasonable side effect or adverse reaction and when placed in the stream of commerce they contained unreasonably dangerous defects subjecting Plaintiffs to risks from expected or known usage, including bodily injury and death, which exceeded the benefits of the subject drugs;

    b.  when placed in the stream of commerce the subject drugs were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and weight loss; c)the subject drugs contained insufficient and/or ineffective warnings to alert consumers and users to the risks of injury and death by PPH;

    c.  the subject drugs were insufficiently tested (singularly or in combination);

    d.  there were insufficient instructions on the proper use of the subject drugs;

    e.  there was misleading advertising and promotion concerning the safety and benefits of using the subject drugs;

    f.  there were inadequate post-marketing warnings or instructions because, after Defendants

knew or should have known of the significant risks previously described, Defendants failed to provide adequate warnings to users and consumers, and/or their physicians, and continued to promote the sale and use of the subject drugs; and

g.  the subject drugs had not been materially altered or modified prior to the use of said drugs by Plaintiffs; d) Defendants were in the business of distributing and selling the products made the basis of this lawsuit.  Defendants sold and/or distributed these products in a defective condition that was unreasonably dangerous to the user or ultimate consumer of this product.  Each product was expected to and did reach the user and consumer Plaintiffs without substantial change in the condition at which it was sold.

110.   As a direct and legal result of the defective condition of the drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine, Plaintiffs have sustained and will continue to sustain serious and permanent injuries, physical pain and suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors, physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems associated with their injuries.

111.   Defendant Scott, Defendant Molnar, Defendant Kaiser and certain John Doe Defendants each reside and work in the State of Georgia.  Said Defendants worked for or on behalf of the Manufacturing and Distributing Defendants herein in the State of Georgia, and elsewhere throughout the United States, at times relevant to this cause, and each actively and personally participated in the marketing, distribution, promotion and advertising in each state that the subject diet drugs were ultimately used by Plaintiffs, resulting in injury to Plaintiffs.

112.   The tortious actions and misdeeds of Defendants as alleged herein are ongoing and at all times relevant hereto were ongoing and continuous and constituted ongoing and continuous torts.

## COUNT I (STRICT LIABILITY—DEFECTIVE PRODUCT)

113.     Plaintiffs adopt and re-alleges each paragraph above, as if fully set forth herein.

114.     The allegations set forth under Count I apply only to the Manufacturer Defendants as identified hereinabove.

115.     The fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine drugs which were designed, developed, researched, manufactured, and/or supplied by the Manufacturer Defendants were not merchantable nor reasonably suited to their intended use due to design defects in the subject drugs.

116.     The risk of severe and life threatening complications and other side effects associated with use of the subject diet drugs constituted dangers and risks which were inherent in the design of the drugs that served to outweigh any utility the drugs may have had.

117.     The Manufacturer Defendants, individually and collectively, knew, or should have known, that fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine were, and are, dangerously defective products that posed an unacceptable risk unknown to, and unknowable by, the consuming public.

118.     Plaintiffs have suffered injury and have incurred damages as a direct and proximate result of the design defects existing in regard to fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine causing Defendants to be liable to Plaintiffs under the doctrine of strict liability due to the defective nature of the subject drug products.

## COUNT II (STRICT LIABILITY—FAILURE TO WARN)

119.     Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

120.     The allegations set forth under Count II apply only to the Manufacturer Defendants as identified hereinabove.

121.     At the time the Manufacturer Defendants placed fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine into the stream of commerce for sale or consumption by Plaintiffs, said Manufacturer Defendants failed to accompany said inherently

dangerous products with sufficient warnings to advise doctors or consumers of the health risks associated with the subject drugs.

122.     To the extent that any warning was provided by the Manufacturer Defendants with the subject drug products, the warning was defective as it did not accurately reflect the true dangers associated with the defective drug products and did not accurately serve to warn physicians or consumers of:

(a) the true risks of injury associated with the products;

(b) the symptoms of such injuries;

(c) the scope of such injuries; or

(d) the severity of the known risks associated with these products.

123.     As a direct and proximate result of the Manufacturer Defendants' failure to provide adequate warnings with the subject drug products, Plaintiffs have suffered injury and damages for which they are entitled to recover.

## COUNT III (STRICT LIABILITY—FAILURE TO TEST)

124.     Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

125.     The allegations set forth under Count III apply only to the Manufacturer Defendants as identified hereinabove.

126.     The Manufacturer Defendants failed to perform adequate testing of the subject drug products prior to placing said products in the stream of commerce, in that adequate testing would have shown that fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine each posed a substantial and serious risk of harm to consumers of the drugs which were not accurately disclosed.

127.     As a direct and proximate result of the Manufacturer Defendants' breach of their duty to adequately test the subject drug products, Plaintiffs have suffered injury and damages for which they are entitled to recover.

## COUNT IV (NEGLIGENCE)

follow-up examinations so that primary pulmonary hypertension (PPH) could be avoided and/or detected early;

f.  Defendants acted negligently in failing to warn Plaintiffs that use of the drugs carried a risk of temporary or permanent disability due to primary pulmonary hypertension (PPH) while at the same time promoting dangerous use of the drugs alone and in combination;

g.  Defendants acted negligently in failing to warn Plaintiffs that use of the drugs carried a risk that heart transplant and lung transplant might become necessary to repair damages caused by the drugs; and

h.  Defendants acted negligently in failing to provide post-marketing warnings or instructions after Defendants knew or should have known of the significant risks of pulmonary and/or cardiovascular injury from the use of the drugs.

132.    Defendants knew or should have known that the drugs caused unreasonably dangerous risks and serious side effects of which Plaintiffs would not be aware. Defendants nevertheless manufactured, packaged, advertised, marketed, promoted, sold and distributed the subject diet drug products in a negligent manner knowing that there were safer methods and products for weight loss and/or weight control.

133.    As a direct and proximate result of the negligence of Defendants, Plaintiffs have sustained, and will continue to sustain in the future, serious and permanent injuries; physical pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings; loss of the ability to earn money in the past and the future; expense of hospitalization; medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems associated with their injuries, and as otherwise set forth under this Complaint.

## COUNT V (BREACH OF WARRANTIES)

134.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

135.    When the Manufacturer Defendants and certain John Doe Defendants placed the subject drugs into the stream of commerce, they knew of the use for which the drugs were intended (as diet aids and weight loss medications), and expressly and impliedly warranted the products to be of merchantable quality and to be safe and fit for such use.

136.    Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of the Manufacturer Defendants and certain John Doe Defendants and upon the express and/or implied warranty that the drugs were of merchantable quality and fit for use for weight loss and/or weight control.

137.    The drugs were not of merchantable quality and were not safe or fit for their intended use because the products were, and are, unreasonably dangerous and unfit for the ordinary purposes for which they were used, in that they caused injury to Plaintiffs and others far beyond any acceptable or warned side effect.  Said drug products were unduly dangerous in expected use and did cause undue injury to Plaintiffs.

138.    As a direct and proximate result of the Manufacturer Defendants' and certain John Doe Defendants' breach of both implied and expressed warranties, Plaintiffs has suffered injuries and sustained damages.

139.    As a direct and proximate result of the breach of warranty by the Manufacturer Defendants and certain John Doe Defendants, Plaintiffs have sustained and will continue to sustain serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish

145.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered injury and damages; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

## COUNT VII (NEGLIGENT AND RECKLESS MISREPRESENTATION)

146.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

147.    Defendants negligently and recklessly represented to Plaintiffs, Plaintiffs' physicians, state medical boards, state pharmacy boards, state regulators and other persons and professionals on whom it was known by Defendants that Plaintiffs would rely, as well as the public at large, that the subject diet drug products were safe to ingest and that the utility of these products outweighed any risk in use for the intended purpose of weight loss and/or weight control.  Also, by negligently failing to disclose to Plaintiffs, and others for the benefit of Plaintiffs, important safety and injury information, thereby suppressing material facts about the drugs, while having a duty to disclose such information, which duty arose from their actions of making, marketing, lobbying in support of, promoting, distributing and selling pharmaceutical products to Plaintiffs and others, Defendants further led Plaintiffs to rely upon the safety of the product in its use.

148.    The false representations of Defendants were negligently made, in that the subject drug products in fact caused injury, were unsafe, and the benefits of their use were far outweighed by the risk associated with use thereof.  Defendants, individually and collectively, committed acts of negligent misrepresentation and negligent concealment by suppressing material facts relating to the dangers and injuries associated with, and caused by, the use of the subject drugs.

the health risks associated with these products as known by Defendants. Defendants entered this conspiracy that included those acts previously described concerning various studies and reports which were not disclosed to the consuming public, and the other specific allegations regarding fraud and misrepresentation made hereinabove.

154.    Defendants conspired together to commit the tort of fraud and misrepresentation upon Plaintiffs, in the same manner as contained in the allegations of fraud, concealment and misrepresentation stated above, knowing that same would lead to increased sales of said products and personal gain to each Defendant with a proportionate increased incidence and risk of injury and death to Plaintiffs.

155.    Each Defendant herein participated in combination in the conspiracy to defraud, conceal and misrepresent, which conspiracy had an unlawful, oppressive, and immoral purpose (to increase profits by increasing incidences and risks of death and injury) and/or achieved its purpose by unlawful, oppressive and immoral means (the suppression and fraudulent misrepresentation of material facts regarding important safety and health information which Defendants had a duty to disclose and disseminate under applicable state and federal law) and did commit overt acts in furtherance of the conspiracy, which was a legal cause of actual injury and damage to Plaintiffs.

156.    As a result of the conspiracy, Defendants made fraudulent misrepresentations to Plaintiffs and others as set forth above, and important safety and injury information was concealed from and misrepresented to Plaintiffs, and others upon whom Plaintiffs relied, with the intent that Plaintiffs would rely upon the misrepresentations and absence of concealed information, as more specifically set forth above.

157.    As a result of the conspiracy, Plaintiffs relied upon the misrepresentations of fact as specifically stated above, and did rely upon the absence of important safety and injury information, and as a result was injured and suffered serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental

anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

### COUNT IX (JOHN DOE DEFENDANT LIABILITY)

158.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

159.    The John Doe Defendants listed in this Complaint, whose identities at this time are unknown, are also liable to Plaintiff in strict liability, negligence, breach of expressed and implied warranty, fraud and misrepresentation, negligent and reckless misrepresentation, and conspiracy to defraud and fraudulently conceal, as well as those other actions pled in this Complaint.

160.    As a direct and proximate of the aforementioned tortious acts, Plaintiffs were injured and suffered damages including, but not limited to: (permanent and ongoing into the future) injury to Plaintiffs' hearts and other physical injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

### COUNT X (SALES DIRECTOR DEFENDANT LIABILITY)

161.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems as otherwise set forth under this Complaint.

### COUNT XI (JOINT AND SEVERAL LIABILITY)

165.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

166.    By virtue of their individual and collective acts and omissions, Defendants are jointly and severally liable to Plaintiffs as such acts and omissions have proximately caused Plaintiffs to suffer a single indivisible injury for which each Defendant is responsible.

### COUNT XII (PLAINTIFF'S DAMAGES)

167.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

168.    As a result of the individual, combined and concurring acts and omissions of Defendants as set forth herein above, each above-named Defendant, caused or contributed to cause the following injuries to Plaintiffs:

a.      Plaintiffs have been caused to suffer physical injury, past, present and future pain and suffering, disability, impairment, lost capacity to enjoy life, mental anguish, and lost earnings in an amount to be proven at trial;

b.      Plaintiffs have been caused to incur medical expenses and will in the future incur medical expenses an amount to be proven at trial;

c.      Plaintiffs have been caused to undergo medical monitoring and will be required to undergo medical monitoring for the rest of Plaintiffs' lives an amount to be proven at trial; and

d.      Plaintiffs have been caused to suffer past, present and future fear and mental anguish concerning their present and future medical problems including but not limited to those associated with her injuries in an amount to be proven at trial.

### COUNT XIII (PUNITIVE DAMAGES)

169.    Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

170.    The allegations under this Count relate to Defendants Interneuron and Celltech only.

171.    The conduct of each Defendants Interneuron and Celltech as set forth herein above was intentional, willful, wanton, oppressive, malicious, and reckless, evidencing such an entire want of care as to raise the presumption of a conscious indifference to the consequences in that Defendants Interneuron and Celltech acted only out of self interest and personal gain. Such conduct evidences a specific intent to cause harm to Plaintiffs as provided under O.C.G.A. § 51-12-5.1. Accordingly, punitive damages should be imposed against Defendants Interneuron and Celltech pursuant O.C.G.A. § 51-12-5.1 and other applicable laws, to punish and deter Defendants Interneuron and Celltech from repeating or continuing such unlawful conduct.

**WHEREFORE, Plaintiffs pray:**

(a)     That process issue according to law;

(b)     That each Defendant be served with a copy of Plaintiffs' Complaint and show cause why the prayers for relief requested by each Plaintiff herein should not be granted;

(c)     That Plaintiffs be granted a trial by jury in this matter;

(d)     That the Court enter a judgment against each Defendant, jointly and severally, for all general and compensatory damages allowable to Plaintiffs under the terms of the National Settlement, to the extent it applies;

(e)     That the Court enter a judgment against each Defendant, jointly and severally, for all special damages allowable to Plaintiffs under the terms of the National Settlement, to the extent it applies;

(f)     That the Court enter a judgment against Defendants Interneuron and Celltech serving to award Plaintiffs punitive damages under the provisions of O.C.G.A. § 51-12-5.1;

(g)     That the Court enter a judgment against each Defendant, jointly and severally, for all other relief sought by Plaintiffs under this Complaint in a manner consistent with the National Settlement, to the extent that it applies;

(h)     That the costs of this action be cast upon Defendants; and

(i)     That the Court grant Plaintiffs such further relief which the Court deems just and

appropriate.

Respectfully submitted this 29th day of June, 2003.


_____ /s/ Robert C. Buck __ _____ _
**CHILDERS, BUCK & SCHLUETER, LLP**
Robert C. Buck
Georgia Bar No. 092495
C. Andrew Childers
Georgia Bar No. 124398
**940 Center Street**
**Conyers, Georgia 30012**
**(770) 388-9000**
(effective through July 14, 2003)

**Suite 1601**
**260 Peachtree Street**
**Atlanta, Georgia 30303**
**(404) 419-9500**
(effective as of July 15, 2003)


_____ /s/ Charles A. Mathis, Jr. __ _ _ _
**THE MATHIS LAW FIRM**
Charles A. Mathis, Jr.
Georgia Bar No. 477025
**The Equitable Building**
**Suite 1400**
**100 Peachtree Street, N.W.**
**Atlanta, GA 30303**
**(404) 523-5000**


_____ /s/ Paul J. Napoli. __ _ ___
**NAPOLI, KAISER, BERN & ASSOCIATES, LLP**
Paul J. Napoli
(Pro Hac Vice Application Filed Herewith)
**3500 Sunrise Highway**
**Suite T-207**
**Great River, New York 11739**
**(631) 224-1133**

**Attorneys for Plaintiffs**

***EFILED***
LexisNexis FilingID: 1961570
Date: Jun 30 2003 9:50AM
Stefani Searcy, Clerk

DO NOT WRITE

GEORGIA
FULTON COUNTY

STATE COURT OF FULTON COUNTY
        (Civil Division)

**ELLEN B. MCFARLAND, DANIELLE DONO,
AUGUSTUS B. RANDLE, RHONDA BAILEY,
RENELL BEACH, RICHARD H BRYAN,
REBECCA BULLARD, ROBERT L
CARMIGNANI, RICHARD A. COBB, ROBERT
COHAN, ROBERT G. COHEN, RICHARD L
CONRAD, RODNEY DAVIS, REGINA M
DUNSTER, REBECCA ETHERTON, ROBERT
M FAIRFIELD, RINDALEE FORSYTH,
RICHARD FOWLER, ROBERT GRAY,
ROBERT D. HELLYER, ROBERT J
HERBOLICH, RENITA H HUNLEY, ROBERT L
JOLLEY, RICHARD E. JUDD, ROBBIE R
KELL, RENEE M LONCKE, REGINA
LOWMAN-CURBEAN, ROBERT G LUCE,
ROBIN MACARTHUR, ROBERT MCCLAMY,
RITA M MOORE, RHONDA G MULLINS,
RICHARD D NELL, ROBERT E NICHOLS,
ROBERT NOVOTNY, RICHARD F ORLUK,
REBECCA A PANTUSO, RICHARD N. PILANT,
ROBERTA RINALDI, RICHARD ROCHA,
RHONDA SAMPLE, REBECCA D SCHULTZE,
RICHARD E. SCUTERI, REGINA STANLEY,
REGINA W STEPHENS, REBECCA A. TENA,
ROBERT E VANDERPOOL, RICHARD
WELDON, RHONDA WILMOT, RENEE K.
YANCEY,**

        **Plaintiffs,**
        (Plaintiff's Name and Address)

        VS.

**WYETH, INC., f/k/a AMERICAN HOME
PRODUCTS CORPORATION;
WYETH PHARMACEUTICALS, INC f/k/a
WYETH-AYERST PHARMACEUTICALS,
INC., a Division of American Home Products,
Corporation; INDEVUS
PHARMACEUTICALS, INC., f/k/a
INTERNEURON PHARMACEUTICALS, INC.;**

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| ___Account | Principal $_____ |
| ___Contract | |
| ___Note | Interest  $_____ |
| ___Tort | |
| ___Trover | Atty. Fees$_____ |
| ___Special Lien | |

**CELLTECH PHARMACEUTICALS, INC.;**      ___Foreign Judgment   Ct. Costs $_____
**ROBERT L. SCOTT, a citizen of the**        _X_ Personal Injury
**State of Georgia; JOHN A. MOLNAR,**
**a citizen of the State of Georgia;**
**STEVEN KAISER a citizen of the**
**State of Georgia;, a citizen of the State of Georgia;**
**and JOHN DOE NOS. 1 and 2,**

    (Defendant's Name and Address)

        **SUMMONS**

TO THE ABOVE-NAMED DEFENDANT:      _____
You are hereby required to file with the Clerk of said Court and to serve a copy on the Plaintiff's Attorney, or on
Plaintiff if no Attorney, to-wit:

Robert C. Buck _ _ _ _ _ _ _ _      _X_ NEW FILING
 (Name)                           ___REFILING
940 Center Street, Conyers, GA 30012      PREVIOUS CASE NO._____
 (Address)
770-388-9000 _ _ _ _ _ _ _ _
 (Phone No.)

an Answer to the Complaint which is herewith served on you, within (30) days after service on you, exclusive of the
day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the
Complaint, plus cost of this action.

This_____      _____
                            DEPUTY CLERK

             **WRITE VERDICT HERE**
We, the Jury, find for _____
_____
_____

This _____ day of _____, 200____.

                      _____
                      FOREPERSON

***EFILED***
LexisNexis FilingID: 1961570
Date:  Jun 30 2003  9:50AM
Stefani Searcy, Clerk

## IN THE STATE COURT OF FULTON COUN
### STATE OF GEORGIA

ELLEN B. MCFARLAND, DANIELLE   DONO,
AUGUSTUS B. RANDLE, RHONDA   BAILEY,
RENELL    BEACH, RICHARD H BRYAN,
REBECCA     BULLARD,   ROBERT    L
CARMIGNANI, RICHARD A. COBB, ROBERT
COHAN, ROBERT G. COHEN, RICHARD L
CONRAD, RODNEY   DAVIS, REGINA  M
DUNSTER, REBECCA ETHERTON, ROBERT M
FAIRFIELD, RINDALEE  FORSYTH, RICHARD
FOWLER, ROBERT    GRAY, ROBERT   D.
HELLYER, ROBERT J HERBOLICH, RENITA H
HUNLEY, ROBERT L JOLLEY, RICHARD E.
JUDD, ROBBIE R KELL, RENEE M LONCKE,
REGINA    LOWMAN-CURBEAN, ROBERT G
LUCE,  ROBIN    MACARTHUR,   ROBERT
MCCLAMY, RITA M MOORE, RHONDA  G
MULLINS, RICHARD D NELL, ROBERT  E
NICHOLS, ROBERT NOVOTNY, RICHARD F
ORLUK, REBECCA A PANTUSO, RICHARD N.
PILANT, ROBERTA    RINALDI, RICHARD
ROCHA, RHONDA   SAMPLE, REBECCA D
SCHULTZE, RICHARD E. SCUTERI, REGINA
STANLEY, REGINA W STEPHENS, REBECCA A.
TENA, ROBERT E VANDERPOOL, RICHARD
WELDON, RHONDA   WILMOT, RENEE  K.
YANCEY,

  Plaintiffs,

vs.

WYETH, INC., f/k/a AMERICAN HOME
PRODUCTS CORPORATION;
WYETH PHARMACEUTICALS, INC f/k/a
WYETH-AYERST PHARMACEUTICALS,
INC., a Division of American Home Products
Corporation; INDEVUS
PHARMACEUTICALS, INC., f/k/a
INTERNEURON PHARMACEUTICALS, INC.;
CELLTECH PHARMACEUTICALS, INC.;
ROBERT L. SCOTT, a citizen of the State of
Georgia; JOHN A. MOLNAR, a citizen of the
State of Georgia; STEVEN KAISER a citizen
of the State of Georgia; and JOHN DOE
NOS. 1 & 2,

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | CIVIL ACTION FILE |
| ) | |
| ) | NO. |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

1

Defendants. )
)
)

## APPLICATION OF PAUL J. NAPOLI FOR ADMISSION PRO HAC VICE

Pursuant to U.S.C.R. 4.4, Paul J. Napoli hereby respectfully applies to this Honorable Court for leave to appear on behalf of the Plaintiffs in the above-styled action.

Paul J. Napoli is a member of the law firm of Napoli Kaiser Bern & Associates, LLP, located at 114 Old Country Road, Suite 116, Mineola, New York 11501. Napoli Kaiser Bern & Associates, LLP's office telephone number is (516) 873-8918.

Paul J. Napoli is duly licensed to practice law in the state of New York.

Paul J. Napoli has associated with Robert C. Buck and C. Andrew Childers, both of whom are residents of the State of Georgia, and both of whom are duly and regularly admitted to practice in the Superior Courts of the State of Georgia.

Robert C. Buck and C. Andrew Childers are members of the law firm Schlueter, Buck & Childers, located at 940 Center Street, Conyers, Georgia 30012. The telephone number of Schlueter, Buck & Childers is (770) 388-9000.

Service may be had upon Robert C. Buck and C. Andrew Childers in all matters connected with the above-styled action with the same effect as though personally made upon Paul J. Napoli.

This the 29th day of June, 2003.

_____ /s/ Paul Napoli _____ _____
**NAPOLI KAISER BERN & ASSOCIATES, LLP**
Paul J. Napoli – Member in Good Standing of New York
State Bar
**114 Old Country Road, Suite 116**
**Mineola, New York 11501**

_____ /s/ C. Andrew Childers _____

2

**SCHLUETER, BUCK & CHILDERS**
Robert C. Buck  - State Bar of Georgia No. 092495
C. Andrew Childers - State Bar of Georgia No. 124398
**940 Center Street**
**Conyers, Georgia 30012**

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

ELLEN B. MCFARLAND, DANIELLE   DONO,
AUGUSTUS B. RANDLE, RHONDA  BAILEY,
RENELL    BEACH, RICHARD  H  BRYAN,
REBECCA        BULLARD,    ROBERT    L
CARMIGNANI, RICHARD A. COBB, ROBERT
COHAN, ROBERT  G. COHEN, RICHARD  L
CONRAD,  RODNEY    DAVIS, REGINA  M
DUNSTER, REBECCA ETHERTON, ROBERT M
FAIRFIELD, RINDALEE  FORSYTH, RICHARD
FOWLER,  ROBERT    GRAY,  ROBERT  D.
HELLYER, ROBERT J HERBOLICH, RENITA H
HUNLEY, ROBERT  L JOLLEY, RICHARD E.
JUDD, ROBBIE R KELL, RENEE M LONCKE,
REGINA    LOWMAN-CURBEAN, ROBERT  G
LUCE,  ROBIN    MACARTHUR,  ROBERT
MCCLAMY, RITA M MOORE, RHONDA  G
MULLINS, RICHARD  D NELL, ROBERT  E
NICHOLS, ROBERT  NOVOTNY, RICHARD F
ORLUK, REBECCA A PANTUSO, RICHARD N.
PILANT, ROBERTA    RINALDI,  RICHARD
ROCHA, RHONDA    SAMPLE, REBECCA  D
SCHULTZE, RICHARD E. SCUTERI, REGINA
STANLEY, REGINA W STEPHENS, REBECCA A.
TENA, ROBERT E VANDERPOOL, RICHARD
WELDON, RHONDA   WILMOT, RENEE  K.
YANCEY,

|  |  |  |
|---|---|---|
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION FILE |
| | ) | |
| WYETH, INC., f/k/a AMERICAN HOME | ) | NO. |
| PRODUCTS CORPORATION; | ) | |
| WYETH PHARMACEUTICALS, INC f/k/a | ) | |
| WYETH-AYERST PHARMACEUTICALS, | ) | |
| INC., a Division of American Home Products | ) | |
| Corporation; INDEVUS | ) | |
| PHARMACEUTICALS, INC., f/k/a | ) | |
| INTERNEURON PHARMACEUTICALS, INC.;) | | |
| CELLTECH PHARMACEUTICALS, INC.; | ) | |
| ROBERT L. SCOTT, a citizen of the State of | ) | |
| Georgia; JOHN A. MOLNAR, a citizen of the | ) | |
| State of Georgia; STEVEN KAISER a citizen | ) | |
| of the State of Georgia; and JOHN DOE | ) | |
| NOS. 1 & 2, | ) | |

4

```
                                      )
    Defendants.                       )
                                      )
_____    )
```

## ORDER APPROVING THE APPLICATION OF PAUL J. NAPOLI FOR ADMISSION PRO HAC VICE

The Application of Paul J. Napoli for Admission Pro Hac Vice having come before this Court, and the Court having read and considered the same, and for good cause shown, it is ORDERED that said Application be granted, and that Paul J. Napoli be admitted to practice in this Court pro hac vice.

SO ORDERED THIS _____ DAY OF _____, 2003.

_____
Judge, State Court of Fulton County

5